[Civ. No. 2763. Fourth Dist. July 17, 1941.]

GEORGE D. LYON, Respondent, v. FRANK HAVEN MAC-QUARRIE, Appellant.

Freston & Files and Ralph E. Lewis for Appellant.

W. I. Gilbert and Joe Fainer for Respondent.

MARKS, J.—This is an appeal from a judgment awarding plaintiff $33,244.92, being one-half of the profits found to have accrued from the radio production entitled, "Do You

Want to be an Actor?'', which was alleged and found to have been produced by plaintiff and defendant as co-partners.

The sole ground urged for the reversal of the judgment is that the evidence is insufficient to support the findings to the effect that a partnership had existed and the conclusions of law drawn from those findings.

Defendant had been connected with the theatrical business for many years during which time he had presented an act on the Orpheum Vaudeville Circuit under the headline "Do You Want to be an Actor?" After the collapse of vaudeville he had been engaged in various undertakings. In 1935, he was operating an actors' employment agency in Hollywood under the name of "The MacQuarrie Agency."

In 1935, Lyon was a civil service commissioner of the city of Los Angeles. He was also engaged in writing insurance. He met MacQuarrie during that year and the two became friends. He was given desk room in MacQuarrie's place of business. MacQuarrie introduced Lyon to prospects for insurance among his customers and Lyon brought some new patrons for the agency and found employment for some of them as well as for some old customers. In this way both profited to some small degree from Lyon's efforts though MacQuarrie received no part of Lyon's insurance premiums. The arrangement probably had its inception in both the friendship existing between the two men and MacQuarrie's belief that Lyon's political connections would enable them to contact persons he could not reach otherwise.

Up to this point in the contact of the two men there is no material conflict in the evidence that could affect the results of the action. The testimony concerning their later relations is in such flat conflict as to suggest more than faulty memories on the part of one group of witnesses or the other. Under the fixed rule that conflicts in the evidence are addressed to the trial judge and are settled by him and that on appeal the evidence supporting the findings and judgment must be accepted as true, we will confine our summary of the evidence to that portion of it supporting the decision of the trial court.

In July or August, 1936, MacQuarrie conceived the idea of putting his old vaudeville act of "Do You Want to be an Actor?" on the radio. He communicated this idea to Lyon and asked him if he had any contacts with anyone in the radio production business. Lyon made one appointment for

the following afternoon. The two arrived early for the appointment, and, according to Lyon, the following conversation occurred:

"A. He (MacQuarrie) said, 'We have been starving out in this agency of ours in Hollywood, and there is no reason why we should continue to do it. I think that this act that went over on the stage would go over the radio. What do you think about it?' 'Well, I think it is a grand idea.' And he said, 'We have always been partners in the agency business and there is no reason, if this goes over, why you cannot have that house you have been talking about on Silver Lake, and I can have the house I want up in the hills where it won't be so hard on my asthma.' And said, 'What do you think; are you willing to go in with me on it?' I said, 'Why, of course.' He said, 'The reason I want you particularly is, you have had business experience, and if we get into this thing, this radio act, there are going to be a lot of business details and so forth that I want you to attend to.' He said, 'I know I can trust you because we have been together a year and a half and we have always gotten along very well. Never had any difficulties. We have always split our earnings, and what was mine was yours, and what was yours was mine. Will you go in with me on it?' He said, 'Will you be my partner in this thing and do all this work and help me in a general way?' I said, 'Why of course I will.' He said, 'All right; shake. To make our first million, let us go up and see Robert Braun.'

"Q. Did you discuss with him at that time on what basis the partnership would be?

"A. We said we have always been together and whatever was yours was mine and vice versa. And 'Whatever I make in this, fifty per cent is yours.' I said, 'Isn't this a coincidence, because that steel deal I was telling you about—the hardening of steel out of a product called tetralloy that I have had.' I said, 'It is just a coincidence. I am going to make some money on that.' And I said, 'You are in fifty per cent on that deal with me, just like I am fifty per cent on this radio act with you.' He said, 'O. K.; that is O. K. by me; shake. We are partners.' "

The two then talked about the radio production to a Mr. Braun, who was much interested. According to Lyon the interview ended as follows: "Yes. He (MacQuarrie) said,

'You know, Mr. Braun, you are not just doing this for me.' He said, 'This is an opportunity to help your friend George Lyon, because George is my partner in this, and whatever we make in this radio act, we share and share alike.' "

MacQuarrie finally made contact with the operators of a radio station over which the program was broadcast on a trial or sustaining basis without compensation to him. The first program was broadcast on September 7, 1936, and was continued thereafter on the same basis until November 16, 1936, when a contract was signed between MacQuarrie and the studio under the terms of which MacQuarrie was paid a bonus of $10,000 and $900 a week for the production. About the middle of December, 1936, a second contract was entered into with the agents of the owner of a nationally advertised product under the terms of which MacQuarrie received $5,000 per week for the broadcast of his radio play, "Do You Want to be an Actor?" The broadcast under this contract was continued until the late spring of 1937. On January 4, 1937, MacQuarrie repudiated his contract with Lyon and refused to pay him any of the profits received under either of the two contracts.

Lyon had an eight per cent interest in the Tetralloy Corporation. He testified that under his contract with MacQuarrie this interest became an asset of the partnership and the trial court so found. It has little or no value.

Lyon testified as to the division of duties between himself and MacQuarrie under the partnership contract. He was positive that he had performed all of his duties under it until January 4, 1937, when MacQuarrie repudiated the contract.

According to Lyon, MacQuarrie received the payments for the broadcasts in the form of checks made payable to Mac-Quarrie. MacQuarrie, usually accompanied by Lyon, presented these checks to the bank on which they were drawn and took cashier's checks made payable to MacQuarrie, which were kept in a bureau drawer in his home. On several occasions Lyon asked MacQuarrie when the receipts from the broadcasts were to be divided, and MacQuarrie told him there would be no division at the time, but that when a good big sum had accumulated there would be a division and the two would have a real melon to cut.

Plaintiff produced several witnesses who testified to various conversations with MacQuarrie concerning the radio program,

in which MacQuarrie was quoted as saying, in effect, that he and Lyon were partners in the program and were going to share whatever they made out of it, fifty-fifty; that they were partners in "Do You Want to be an Actor?"; that the radio program was going very nicely and they (MacQuarrie and Lyon) were really going to put it over and were waiting for a suitable sponsor and would make a million dollars apiece. Another witness testified that MacQuarrie said to him concerning the Tetralloy process: "Well, you had better hurry up and make some money, because you know George (Lyon) and I are partners and he has a partnership with me in this 'Do You Want to be an Actor' program. . . . "

Defendant urges that as the partnership rested in parol the burden was upon plaintiff to establish it and its essential elements by clear and convincing evidence. (*Welch* v. *Alcott,* 185 Cal. 731 [198 Pac. 626]; *Swanson* v. *Siem,* 124 Cal. App. 519 [12 Pac. (2d) 1053]; *Blinn* v. *Ritchie,* 101 Cal. App. 691 [282 Pac. 390].)

While this is true, what is clear and convincing evidence is a question of fact addressed in the first instance to the trial judge. His finding on that question cannot be disturbed on appeal where, as here, there is substantial evidence supporting the finding of the existence of a partnership.

Defendant next urges that the evidence fails to show the intent of the parties to enter into a partnership which the law requires. The evidence fails to sustain this argument. The intent to form a partnership may be implied from the conduct of the parties (*Sterman* v. *Ziem,* 17 Cal. App. (2d) 414 [62 Pac. (2d) 160]), as well as established by direct evidence. Here the evidence justifies the conclusion that the parties expressly agreed to hold in joint equal ownership the radio production and the eight per cent interest in the Tetralloy Corporation. The duties of each in connection with the radio production were understood and for a time carried out. There was an express agreement to share the profits equally which is an incident of partnership. While there was no agreement to share losses, that obligation follows from the relationship. (Sec. 2409, Civil Code.) This evidence sufficiently supports the finding of an intent to form a partnership.

That there was no complete control of every part of the venture vested in each partner does not negative the existence of a partnership, for, by agreement, one partner may

be given the duty of management of the partnership enterprise or any part of it. (*Thompson* v. *O. W. Childs Estate Co.*, 90 Cal. App. 552 [266 Pac. 293]; *Associated Piping & Engineering Co., Ltd.*, v. *Jones*, 17 Cal. App. (2d) 107 [61 Pac. (2d) 536].)

█ Nor does the fact that the contribution of the partners to the assets of the partnership was not of equal value positively negative the fact of the formation of a partnership. It is merely a circumstance to be passed upon and weighed by the trial judge in determining whether or not a partnership was in fact formed. (*Griggs* v. *Clark*, 23 Cal. 427; *Whitley* v. *Bradley*, 13 Cal. App. 720 [110 Pac. 596].) █ When there is evidence supporting the finding of the formation of a partnership the decision of the trial judge on this question is as final as it is on any other like controverted question of fact.

█ The fact that the contracts for the production of the radio play were made in the name of MacQuarrie and the payments were made to him are merely circumstances bearing on the question of the formation of the partnership. Of themselves those circumstances are not sufficient to disprove the existence of the relationship between the two men. When MacQuarrie received and kept the receipts from the partnership business he became indebted to the partnership for the amount so retained by him. (*Pritchard* v. *Mercantile Trust Co.*, 65 Cal. App. 327 [224 Pac. 103].)

█ Defendant argues that "Do You Want to be an Actor?" was merely an idea in his mind and was "not the subject of ownership" so that it could not be conveyed to the partnership as a part of its assets.

This argument is not impressive. Many businesses and great industrial organizations have sprouted from the germ of an idea in the mind of some man. When the idea is reduced to concrete form and put into action in the form of a business enterprise, an invention, a book, an opera or a theatrical production, the results of the idea are subject to private ownership. This is just the situation we have here. The original idea for the production sprouted in MacQuarrie's brain. The idea was reduced to concrete form and put into action as a theatrical production transmitted to the public over the radio. The production, if not the idea, was the subject of private ownership and under the findings of the trial court became the property of the partnership, which

126

was a partnership at will as no time was fixed by the partners for its duration. (*Harris* v. *Hirschfeld,* 13 Cal. App. (2d) 204 [56 Pac. (2d) 1252].)

As we have already observed, the evidence is flatly and irreconcilably conflicting. A finding that no partnership had been formed, had one been made, would have had considerable evidentiary support. As the finding which was made of the formation and the existence of the partnership has ample support in evidence which was accepted by the trial judge as substantial and which was taken as true by him, we cannot disturb the judgment here.

The judgment is affirmed.

Barnard, P. J., and Kelly, J., *pro tem.,* concurred.

A petition for a rehearing was denied August 13, 1941, and appellant's petition for a hearing by the Supreme Court was denied September 11, 1941.