[Civ. No. 20771.   Second Dist., Div. Two.   Oct. 16, 1956.]

LELAND L. DILLS, Appellant, v. DELIRA CORPORA-
TION (a Corporation) et al., Respondents.

Robert M. Maslow and N. E. Youngblood for Appellant.

Louis Licht and Paul P. Selvin for Respondents.

MOORE, P. J.—Appellant sued for a declaration that Dills, Dowd and Hire are associated as partners and that the partnership owns the idea, format and style for the Wild Bill Hickok radio shows. His demands rejected, he appeals.

In order fairly to appraise the contentions now urged for a reversal of the judgment, a glimpse into the background of the controversy is necessary.

During 1949 Dills and Dowd were merchandise manager and buyer for a popular emporium. After a conference with other merchants, a group of them agreed that a new name and personality should be originated and advertised for the purpose of promoting sales of the products of such merchants by the use of a label bearing the imprint of the new hero. In February 1950, Dills having learned of David Hire's success as a motion picture producer invited him to join the group. Six manufacturers agreed upon the plan and furnished $25,000 to finance a California corporation. On April 13th, the nine persons organized the Delira Corporation and distributed its 25,000 shares equally among themselves. In June 1950 Hire suggested "Wild Bill Hickok" as the promotional hero. By reason of the duties of Dills and Dowd in the emporium, neither could participate in the technical work of developing a radio and television show. Hire was entrusted with the management thereof. By August 1950, Delira's capital had been practically consumed in the production of a "television pilot film and five 15-minute recordings of radio programs." The latter had been produced by "David Hire Productions," which then meant produced by Hire for Delira. At the same time he was vice president of Delira and manager of its productions, while Dowd was its president. Although by February 8, 1951, Kellogg Company, a cereal food manufacturer, had agreed to sponsor the television programs, finance was needed for the production of the radio show. After learning that the mercantile stockholders were not interested in such productions, Hire told Dills that, if the radio show could not be financed through Delira, he, Dills and Dowd "could handle it."

All three of them were stockholders, officers or promoters of, and therefore in a fiduciary relationship to, Delira which relied upon the skill, ability, knowledge and honesty of each of them and for that reason entrusted them with the care and management of its property and affairs. On behalf of Delira they contributed to the conception and development of the radio show and its programs and transcriptions. All were

made under the supervision of Hire on behalf of Delira. He always used the words "David Hire Productions" to designate that Delira was the producer. Its rights and interests in the radio show were a principal asset.

To produce and finance the radio show during the spring of 1951, Hire required $12,000. Late in March, Dills and Dowd agreed with David Hire Productions to advance $8,000 to be used to produce the radio show. For the loan of such money, Hire's company agreed to repay the loan and to pay Dills and Dowd out of the profits of the first runs of the first 39 shows to the extent of 26⅔ per cent thereof to each for the services of Dills and Dowd. Dills insisted upon a promissory note by David Hire Productions in the amount of $8,000 to his favor and upon notes by Hire and Dowd individually to his favor guaranteeing the $8,000 corporate obligation in the amount of $2,666.66 each. The court found that Hire fully performed his promises and that neither Dills nor Dowd had a claim against David Hire Productions on any other account nor any interest in or claim against the profits of the radio show.

After Hire's agreement with Dills and Dowd, a contract was executed by Delira and David Hire Productions whereby the latter was given the exclusive right "to produce the said series of electrical transcriptions" to be broadcast on the radio for 39 weeks; by its terms Delira was released from the obligation to finance the productions or to pay Hire for the transcriptions. However, the contract was never authorized or approved by Delira and none of its shareholders or directors except Hire knew of it, although, on its face, it was a transfer of a principal asset of Delira to David Hire Productions. Furthermore, Hire supplied other stockholders with misleading information calculated to convince them that the production of the radio show would be a speculative venture and not at all to be profitable, notwithstanding Kellogg had agreed to pay for all radio shows produced. As a result of the inaccurate information supplied to the stockholders by those in a fiduciary capacity to Delira, about March 1, 1951, they renounced any intention of financing such radio shows and left the matter to the attention of the David Hire Productions. That event was followed by Dowd and Dills' agreement to advance the $8,000.

Despite the conflict of the evidence as to the extent of the ownership of Dills and Dowd in the radio shows, the court

determined that Hire offered them merely a share in the profits to be derived therefrom for their assistance in advancing the $8,000. As shown above, he paid them two thirds of the net profits. They were not promised an ownership interest but only a share of the profits from the first runs of the first 39 shows produced for Kellogg. Such agreement did not grant to Dills and Dowd reissue or world rights.

The evidence discloses that Hire, acting through an attorney who was ostensibly representing Delira, purchased from it all the rights to Wild Bill Hickok shows but Delira finally asserted its rights and resolved to produce shows for its own account after 1952. Such action was understood to have settled the issue of ownership of Wild Bill Hickok and the shows to be made until this action was filed.

### WAS DILLS WRONGFULLY DENIED A JURY TRIAL?

Appellant complains that the trial court unconstitutionally denied his demand for a jury trial. (Cal. Const., art. I, § 7.) Whether or not appellant was entitled to a jury depends upon the nature of his action. The constitutional provision for a jury trial grants that right only in actions based upon the common law of 1850, in the event the cause of action, or one essentially similar, existed. (*Ripling* v. *Superior Court*, 112 Cal.App.2d 399, 402 [247 P.2d 117]; *Grossblatt* v. *Wright*, 108 Cal.App.2d 475, 483 et seq. [239 P.2d 19].) If the action is addressed to equity powers of the court, the matter is one for the trial court alone or sitting with an advisory jury. (*Bettencourt* v. *Bank of Italy*, 216 Cal. 174, 179 [13 P.2d 659]; *Ripling* v. *Superior Court, supra*; *Olson* v. *Foster*, 42 Cal.App.2d 493, 498 [109 P.2d 388].)

Does this action sound in equity? Since certain facts are neither legal nor equitable, what is the nature of the claim? (*Pacific Indem. Co.* v. *McDonald*, 107 F.2d 446 [131 A.L.R. 208].) This may be determined from the relief sought as well as from the nature of the facts stated. (*Bettencourt* v. *Bank of Italy, supra*, p. 179; *Bank of America* v. *Greenbach*, 98 Cal.App.2d 220, 228-229 [219 P.2d 814]; *Estate of Cazaurang*, 75 Cal.App.2d 217, 225 [170 P.2d 694].) However, even though the general gist of the action is equitable, particular significant and separate issues which were actionable at the common law must be heard by a jury if there is an appropriate demand. (*Robinson* v. *Puls*, 28 Cal.2d 664 [171 P.2d 430]; *Crouser* v. *Boice*, 51 Cal.App.2d 198, 200 [124 P.2d 358].) Here appellant alleged the existence of a

partnership, sought a declaration of his interest therein, an accounting of profits derived from use of partnership property, and declared that certain property was owned by that partnership. As an incident to the account when rendered, he demanded a share of the profits as money had and received by defendants. The trial court concluded that the major relief sought was equitable, ordered a nonjury trial of those issues first and following the trial thereof determined that appellant was *not* a partner of defendants and had no interest in the Wild Bill Hickok shows. Since no such interest existed, there was no need for proceeding with a trial at law upon the common counts.

There is no question but that the trial court properly tried equitable before legal issues. This procedure is particularly useful, where, as here, a determination of the equitable issue may determine the lawsuit and prevent a more costly jury trial. (*Connell* v. *Bowes,* 19 Cal.2d 870, 872 [123 P.2d 456]; *Thomson* v. *Thomson,* 7 Cal.2d 671, 682, 683 [62 P.2d 358, 117 A.L.R. 1]; *Alton* v. *Rogers,* 127 Cal.App.2d 667, 676 [274 P.2d 487].) Courts have stated repeatedly that an action under Code of Civil Procedure section 1060 for declaratory relief is equitable in nature. (*City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68, 81 [142 P.2d 289]; *Adams* v. *Cook,* 15 Cal.2d 352, 362 [101 P.2d 484]; *Bess* v. *Park,* 132 Cal.App.2d 49, 52 [281 P.2d 556]; *Dunlop* v. *Hersum Lbr. Co.,* 126 Cal.App.2d 815, 820 [273 P.2d 22]; *Kaliterna* v. *Wright,* 94 Cal.App.2d 926, 933 [212 P.2d 32]; *Rolapp* v. *Federal etc. Assn.,* 11 Cal.App.2d 337, 342 [53 P.2d 974].) However, most of the cited decisions so held in order to apply some equitable maxim. Only *Kaliterna* v. *Wright* dealt with the denial of a jury trial. Writers and encyclopedias have decried the line of reasoning so adopted, at least insofar as used to deny a jury trial. They suggest that declaratory relief is in itself neither legal nor equitable; they question whether a declaration is sought where legal, coercive relief would have been just as appropriate. (Borchard, Declaratory Judgments, 2d ed., pp. 400-401, 674-676; Declaratory Relief, 15 Cal.Jur.2d §§ 15 and 43, pp. 121-124, 172; Juries, 50 C.J.S., § 16c, p. 732; and see *Moss* v. *Moss,* 20 Cal.2d 640, 643 [128 P.2d 526, 141 A.L.R. 1422].)* This presents a

---

*Other authorities suggesting that actions for declaratory relief are ''*sui generis*'' are *Pacific Indem. Co.* v. *McDonald, supra,* 107 F.2d 446 [131 A.L.R. 208]; note, 13 So.Cal.L.Rev. 170.

difficult problem to the trial court. Determining whether an action is legal or equitable may be a fair-sized task under ordinary circumstances (as in *Ripling* v. *Superior Court, supra,* 112 Cal.App.2d 399), but the problem is multiplied when the relief sought is a *"sui generis"* declaration in which event the court is even deprived of the advantage of considering the prayer as an indication of whether or not the claim is addressed to equity. (*Declaratory Relief,* 15 Cal.Jur.2d § 15, pp. 123-124.)

However, assuming, *arguendo,* that this is the proper analysis to be used in determining whether a litigant has the right to a jury trial, what then is the essential nature of the relief sought here? ■ Appellant demands a declaration that he is a partner and that an accounting of partnership profits be made. Direct authority exists that when such a declaration is sought, the action is one in equity either for the dissolution of a going partnership and an accounting or for a declaration of a trust in partnership property. (*Tobola* v. *Wholey,* 75 Cal.App.2d 351 [170 P.2d 952]; *Lewis* v. *Winfield,* 48 Cal.App.2d 543 [120 P.2d 65]; *Zimmer* v. *Gorelnik,* 42 Cal.App.2d 440 [109 P.2d 34].)† ■ As to appellant's claim of an ownership interest in "Wild Bill Hickok" against the Delira Corporation, which was not alleged to be a partner, it is well settled that an action to establish title which does not include a prayer to obtain possession of the property is equitable in nature. (Code Civ. Proc., § 738; *Thomson* v. *Thomson,* 7 Cal.2d 671, 680 [62 P.2d 358, 117 A.L.R. 1]; *Daniels* v. *Baldwin,* 115 Cal.App.2d 487, 489 [252 P.2d 351]; *Battle* v. *Niece,* 43 Cal.App.2d 655, 658 [111 P.2d 455]; *Santa Ana Mtg. & Inv. Co.* v. *Kinslow,* 30 Cal.App.2d 107, 109-110 [85 P.2d 899].)

■ Regarding appellant's common counts, when it was determined that Dills had no interest in the radio show and that no additional moneys were due him, the common counts performed no office. It is true that Code of Civil Procedure, section 1062, provides that "no judgment under this chapter shall preclude any party from obtaining additional relief based upon the same facts." However, that language provides merely that when one obtains a declaration, he has not thereby forfeited his right to obtain coercive relief. It cer-

---

†It was the dismissal of just such a count which rendered the action "one at law pure and simple" in *Horn* v. *Los Angeles Nut House,* 15 Cal.App.2d 22, 26 [58 P.2d 1299].

tainly was not intended to allow a litigant who is determined not to have any rights to relitigate his claim in quest of different relief.

## EVIDENCE OF A PARTNERSHIP

Dills originally claimed that he had an ownership interest in the idea, style and format of the radio show which he, Dowd and Hire allegedly acquired from Delira in March 1951. However, the trial court found that Delira never parted with its ownership interest in the show. Any action of Delira indicating that it no longer claimed an interest was induced by misinformation supplied by those who stood in a fiduciary relation to the corporation. This finding is not attacked on appeal and is supported by the evidence.

Thus, the most that Dills can claim is that his oral transactions with Dowd and Hire in March through May of 1951 constituted the formation of a partnership between the three for the production of the radio show. In that case, all rights held by Hire are held for and on behalf of the partnership. However, the trial court found that no partnership was created. Dills merely *loaned* money to Hire and David Hire Productions for use in financing and producing the show. The interest for the loan and services in securing the capital was consideration for a share in the profits of the thirty-nine 1951 shows. The principal was repaid and the profits were divided. Transactions of such nature are of frequent occurrence without a partnership's resulting.

A partnership is defined as an association of two or more persons, as coowners, to carry on a business for profit. (Corp. Code, § 15006.) It is true that a partnership relation is to be presumed where parties enter into a profit-sharing agreement and actually share profits (Corp. Code, § 15007, subd. 4), however, such presumption evaporates when substantial evidence is introduced, as here, showing the relationship to be one of borrower-lender with the profit share's being paid for service rendered or money advanced. (Corp. Code, § 15007, subd. 4(d).) Thus, appellant must show that no substantial evidence supports the finding of nonpartnership or that the admitted facts do show a partnership as a matter of law. In this he fails. The facts proved are just as consistent with the theory of a loan and interest as with a partnership.

One of the essential elements in the code definition of a partnership is the "carrying on" of a business, meaning thereby that a "community of interest" exists among the part-

ners. (*Spier* v. *Lang*, 4 Cal.2d 711, 715-717 [53 P.2d 138];
*Freedman* v. *Industrial Acc. Com.*, 67 Cal.App.2d 629, 631
[154 P.2d 922]; *Smith* v. *Grove*, 47 Cal.App.2d 456, 461-462
[118 P.2d 324].) ▆▆ The settled statement on appeal dis-
closes that Dills himself testified that he never approved the
scripts of the radio show; never signed any papers relating
to or connected with the property or business of David Hire
Productions; never looked at the books; never received copies
of the bank statements; never discussed the radio show with
any agency whatsoever; never exercised a function of any
kind connected with the production, distribution or sale of
the show; never performed a task of management, employment
or agency in connection with production; never asked anyone
for authority to do any of the above. Dowd's testimony dis-
closed no more active participation on his part. It is true
that when persons jointly associated agree that management
of the enterprise be entrusted to one of the group, there may
nevertheless be a community of interest in view of the fact
that the making of the agreement to relinquish control is
itself an exercise of the requisite *right to control.* (*Singleton*
v. *Fuller*, 118 Cal.App.2d 733, 741 [259 P.2d 687]; *Lyon* v.
*McQuarrie*, 46 Cal.App.2d 119, 124-125 [115 P.2d 594];
*Associated Piping etc. Co., Ltd.* v. *Jones*, 17 Cal.App.2d 107,
111 [61 P.2d 536].) However, the party seeking to establish
the existence of the partnership in those cases proved the exist-
ence of such an agreement. There was no such proof here,
and the trial court was not obliged to imply an agreement.

### RESTRICTION TO PROFITS FROM FIRST RUNS

The trial court added to its findings the restriction that
appellant's share of the profits from the thirty-nine 1951
shows was to be from only the "first-runs," thereby preclud-
ing him from any share in the profits from the sale of "world"
or "re-issue" rights. Dills urges that this finding cannot be
supported by the evidence since the settled statement on
appeal does not include any reference whatsoever in its sum-
marization of the testimony to "first-runs."

The court adopted the evidence of the agreement of the
three men that each should contribute or procure sufficient
capital to meet the Kellogg commitment for the 39 radio
shows, and that the interest on the investment to Dills and
Dowd was to be a profit share in the *returns from that con-
tract.* Therefore, all that remains is to demonstrate that its
provisions support the findings. A perusal of the corre-

spondence between Hire and the advertising agency representing Kellogg reveals that the agreement was that the cereal company pay $2,050 for each completed and approved show. Later correspondence established that this price did not include "world" or "re-issue" rights. Sale of those rights was left to subsequent bargaining between the parties. Therefore, since Dills was interested only in the profits from the first Kellogg commitment, he had no claim to profits arising from subsequent use of the electrical transcriptions of the 1951 shows. The evidence was substantial and sufficient to support the finding. ▮ Where there is any reasonable doubt as to the sufficiency of the evidence to sustain a finding, the appellate court is in duty bound to resolve the doubt in favor of the finding. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]; *McGrath* v. *Young*, 98 Cal.App.2d 415, 417 [220 P.2d 609].)

The judgment is affirmed.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied November 8, 1956, and appellant's petition for a hearing by the Supreme Court was denied December 12, 1956.