[No. D001064. Fourth Dist., Div. One. Oct. 18, 1985.]

A-C COMPANY, INC., et al., Plaintiffs and Appellants, v.
SECURITY PACIFIC NATIONAL BANK, Defendant and Appellant.

COUNSEL

Pain, Pippin, Cluff & Olson, Pain, Cluff & Olson, David H. R. Pain and Jerry D. Cluff for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps, Jack W. Crumley, Charles A. Bird, Sheppard Mullin, Richter & Hampton, William M. Burke, Jeffrey S. Turner and Timothy B. Taylor for Defendant and Appellant.

## OPINION

**LEWIS, J.**—Security Pacific National Bank appeals a judgment entered against it on the special verdict of a jury, arguing that a jury trial is not available to plaintiffs whose cause of action is based on the equitable doctrine of promissory estoppel. We agree and reverse.

I

### THE FACTS

Robert O. Conley was sole shareholder of A-C Company, Inc. (Company), a general engineering contractor doing underground and surface asphalt and concrete paving. Conley had a banking relationship with Security Pacific National Bank (Bank) for many years, and A-C Company, Inc. began borrowing money from the Bank in 1976 or 1977. The borrowings were short term, usually 60 to 90 days, and eventually increased to $150,000, consisting of two loans evidenced by promissory notes, one for $90,000 payable on demand, or if no demand, on November 6, 1978, and one for $60,000 payable on demand, or if no demand, on November 30, 1978. The loans were based upon, although not secured by, specific accounts receivable. Both notes were guaranteed by Conley.

The Company had been experiencing financial problems in 1978, had a deficiency of working capital, and a loss of over $141,000 for the 31-month period ending December 31, 1978. The financial statements delivered to the Bank by Conley for the period ending May 31, 1978, reflecting good financial conditions were inaccurate. During a dissolution proceeding, Conley signed a stipulation in September 1978 that his Company had a negative net worth of $300,000 and he might be forced to liquidate or file a petition in bankruptcy. Conley requested new financial statements from the Company's

accountants, and the new statements showed losses for the three-month period ending May 31, 1978, of over $217,000, and a positive net worth of $18,986. These statements were delivered to the Bank on November 8, 1978. The Company had been securing its bonds from Fireman's Fund, which decided in November of 1978 to terminate or suspend bonding for the Company.

On December 8, 1977, the Company had been placed on the Bank's "watch list." In August of 1978, at a meeting with Bank officers, Conley was advised the Company was not complying with requirements of its line of credit, because of inadequate financial reporting and failure to apply payments from existing receivables to the corresponding notes. Conley was warned that if the deficiencies were not corrected, the line of credit would be terminated and the accounts would go on a notification basis.

In October 1978, Gale Truesdale, regional vice president of the Bank, decided to terminate the Company's line of credit and told Edward Jones, assistant manager of the El Cajon branch where Conley had been dealing, of his decision. Jones informed Conley on the same day. On October 25, William Tanner, manager of the El Cajon branch, met with Conley to discuss the credit, to confirm it had been terminated, and to remind Conley the receivables should be paid to the Bank when received.

The Company did not pay the notes when due in November and did not apply any portion of the listed receivables to the repayment of the notes.

In December 1978 or January 1979, Truesdale asked Nell Younce, his regional law supervisor, to contact Donovan Martin, first vice president of the Bank, to assist in collecting the loans. Martin, Tanner and Younce met and decided to seek appraisals on four parcels of real property listed in Conley's personal financial statement. Tanner asked Conley to supply the legal descriptions and estimated valuations, and Conley complied. The Bank made further investigation of the properties, and decided to grant a 90-day extension of the loans to May 1, 1979, in exchange for a new note for $150,000 secured by three of Conley's properties. A meeting was arranged for January 31, 1979, at the El Cajon branch. The Bank prepared documents consisting of a $150,000 promissory note from the Company due on demand on May 1, 1979, a continuing guarantee to be signed by Conley, and three deeds of trust on the three properties securing the guaranty. The meeting was attended by Martin, Tanner, Conley and Eleanor Smith, a notary public.

Conley presented an interest check for $4,469.59 and Martin explained the renewal documents and presented them to Conley for signature. Conley

signed and handed to Martin all of the renewal documents except for the trust deed on one property, "the Lakeside Trust Deed," and told Martin he did not want to sign that one because his divorce lawyer, Russell K. Robinson, told him not to encumber that property. Martin handed all of the documents back to Conley and told him to discuss them with his attorney. Martin's and Tanner's testimony was that Martin told Conley to sign and return all of the renewal documents by the close of business Friday, February 2, 1979, or "all bets are off." Conley testified he was asked to review the documents with his attorney and "get back" to Martin before the close of business on Friday.

On the afternoon of January 31, 1979, Conley received a telephone call from a Los Angeles real estate broker that he had an interested buyer for his "Logan" property. Conley met with Robinson on February 1, 1979. Robinson called Martin and they spoke for 10 to 15 minutes. This conversation forms the basis of the disputes.

Robinson testified: He discussed the proposed offer for the Logan property and asked if the Bank would accept an assignment of escrow proceeds in lieu of a deed of trust on that property, and also asked if the Bank would split any cash proceeds from the sale of the Logan property and take an assignment of any paper, and Martin was agreeable; he told Martin that Conley expected to have more information on the Logan property the following week and would get back to Martin one way or the other on the Logan property by Tuesday of the following week; Robinson requested an extension of the due date of the renewable note to September 1, 1979, and this was agreeable to Martin; Robinson and Martin discussed a proposed SBA loan which would be used to retire the renewal note; Robinson concluded the call by stating "this satisfies Mr. Conley's requirements to get back to you before close of business Friday"; there was no discussion of the Lakeside property or the Lakeside deed of trust nor any demand or requirement for delivery of the renewal documents by Friday, February 1, 1979; Conley's only obligation was to get back to Martin by Tuesday of the following week concerning the Logan property sale escrow.

Martin's testimony concerning the conversation was: he explained the Bank's grave concern over the Company's financial condition and Conley's consistent failure to keep his commitments; he reminded Robinson he wanted an answer to the Bank's request for collateral on Thursday and delivery of the renewal documents by the close of business on Friday; Robinson told Martin he was only one of the attorneys representing Conley and must confer with the other attorneys before responding; he hoped to respond later that day, and he was not trying to avoid Martin.

The renewal documents were not delivered to the Bank on Friday, February 2, 1979. Conley took no further action until Tuesday, February 6, 1979, when he checked with his office and found there had been no contract from the Los Angeles broker. Truesdale decided on Monday, February 5, after learning the renewal documents had not been received, to setoff the Bank accounts of the Company, Conley, and A-C Paving and A-C Union 76, related to be proprietorships of Conley. Truesdale was not aware of Martin's Thursday conversation with Robinson. His decision was communicated to Tanner who setoff the accounts. Martin had no decisionmaking authority regarding the setoff and was not consulted, but concurred in Truesdale's decision. On the same day, Martin spoke with Robert Behar, an attorney in the Bank legal department, about the language to put in the written notice of setoff, which was mailed to Conley by both certified and regular mail.

On Tuesday, February 6, Conley continued to make deposits in the accounts in the amount of $3,759. Tanner setoff with respect to the additional deposits, mailed additional setoff notes to Conley, spoke with Conley on the phone and told him of the setoffs, and advised him to call Mr. Duncanson or Mr. Behar in the Bank's legal department. The total amount setoff by the Bank on February 5 and 6 was $148,655.74, including $42,270.66 in additional deposits made by Conley on those two days. As a result of the setoffs, checks totaling $33,912.96 were dishonored by the Bank. Despite various conferences and telephone calls thereafter, the setoffs were not reversed and no subsequent agreements between Conley and the Bank were reached.

Following the setoffs, Conley and the Company suffered loss of employee morale, lost the possibility of an SBA loan, lost credit and reputation in the industry, lost working capital, could not cover payroll, had to enter an arrangement for the benefit of creditors in order to avoid bankruptcy, suffered penalties for failing to pay into union trust funds, had to default on bonded jobs, and Conley suffered severe depression and emotional distress and contemplated suicide.

## II

### THE PLEADINGS AND PROCEEDINGS

On February 22, 1979, Conley and the Company filed a complaint against the Bank for a temporary restraining order, preliminary injunction, declaratory relief and damages, on a cause of action for breach of contract based on an alleged "accord and satisfaction" at the January 31, 1979, meeting.

A jury trial began on June 15, 1983. On that same day, Conley filed an "Amended Complaint for Damages," alleging breach of contract, fraud, intentional infliction of emotional distress, wrongful dishonor of checks and breach of fiduciary duty, with the underlying contract alleged to arise from the "accord and satisfaction." Yet again on that same date, June 15, 1983, Conley offered an amendment to the complaint to allege reasonable reliance upon a promise of the Bank to extend the loans. The Bank objected to the amendment, pointing out that promissory estoppel is an equitable claim to be tried to the court and not the jury, and the injection of an equitable claim would necessitate at least a bifurcation of responsibility if not of trial. Conley's counsel disavowed any intention to assert a cause of action for promissory estoppel, yet asserted promissory estoppel as a substitute for consideration for the contract, which is of course exactly what promissory estoppel is. The court permitted the amendment on the ground the reliance allegations were necessary for causes of action other than promissory estoppel, reserved decision on whether promissory estoppel could be brought into the case, and went ahead with the jury trial.

At the conclusion of plaintiff's case on July 14, 1983, the Bank made a motion for nonsuit on the ground the evidence failed to establish any binding contract to extend the notes to May 1, 1979. Conley responded by offering another cause of action for promissory estoppel, with his counsel arguing, "it is quite obvious that promissory estoppel goes to the very heart of this lawsuit. And as such, I feel a separate cause of action would be appropriate." The court recalled counsel's earlier statement that he was not asserting a cause of action for promissory estoppel and Bank's counsel's objections at the beginning of trial that they were not prepared to proceed if a new and separate cause of action for promissory estoppel was alleged. The court suggested plaintiffs had failed to prove an extension of the notes to May 1, 1979, but had offered enough evidence to go to the jury on a contract to keep the offer to renew open until Tuesday, February 6, 1979.

On July 18, plaintiffs offered a second amended complaint for damages, alleging an agreement by the Bank to hold the offer to renew the notes open until February 6, 1979. The Bank objected to this new pleading, pointing out plaintiffs failed to allege any consideration for such a contract, and was again attempting to insert a cause of action for promissory estoppel.

Plaintiffs' counsel then asserted he was indeed making such a claim, this was a "classic case" of promissory estoppel, "as strong a promissory estoppel case as you could possibly have" and it would be an abuse of discretion to "take the promissory estoppel claim away from the jury or treat a jury verdict as advisory only." Counsel for the Bank once again argued

in vain that a claim for promissory estoppel is tried to a court not a jury, calling the court's attention to *C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1 [151 Cal.Rptr. 323, 587 P.2d 1136].

The court on July 19, 1983, granted the motion for nonsuit as to the cause of action for breach of fiduciary duty, and denied the motion as to all other causes of action, while stating, "I feel, frankly, that the Plaintiff's case at this point is not a strong one." The court also ruled the promissory estoppel cause of action would go to the jury on the ground the cause of action for wrongful dishonor of checks is "really the more important cause of action and therefore the action is essentially a legal one rather than an equitable one.

Apparently in response to this ruling, plaintiffs filed on July 21, 1983, yet a "Third Amended Complaint for 'Breach of Contract,' Fraud and Deceit, Intentional Infliction of Emotional Distress and Breach of Fiduciary Duty." The alleged first cause of action, while entitled "Breach of Contract," alleges a cause of action based on promissory estoppel.

At the end of the case, the Bank moved for directed verdict, which was denied, and renewed once again its objection to submission of the promissory estoppel issue to the jury.

The court instructed the jury that it had found, as a matter of law, there was no consideration to support the alleged promise relative to the first cause of action and then submitted to the jurors a special verdict form wherein the first eight questions were entitled "Contract—A-C Company," but were in fact an outline of a cause of action in promissory estoppel. The questions put to the jurors were:

1. Did the defendant promise not to make any effort to collect on the promissory notes until after February 6, 1979? If you have answered issue No. 1 "yes," then answer the next issue.

2. In making the promise, did defendant reasonably expect that the promise would cause plaintiffs to take action or fail to take action of a substantial character? If you have answered issue No. 2 "yes," then answer the next issue.

3. Did plaintiffs reasonably take action or fail to take action of a substantial character as a result of the promise? If you have answered issue No. 3 "yes," then answer the next issue.

4. Can injustice be avoided only by enforcement of the promise? If you have answered issue No. 4 "yes," then answer the next issue.

5. Did plaintiffs engage in conduct such that it would be inequitable to enforce the promise in their favor? If you answered issue No. 5 "no," then answer the next issue.

6. Did defendant breach the agreement in a material manner? If you answered issue No. 6 "yes," then proceed to issues 7, 9, 19 and 25. If you have answered "no" to any of issues 1, 2, 3, 4 or 6, or "yes" to issue No. 5, return to the courtroom. You need not decide any other issues.

7. Did A-C Company suffer damages as a proximate result of the breach and which in the ordinary course of things would be likely to result from the breach? If you answered issue No. 7 "yes," then answer the next issue.

8. What is the total amount of damage suffered by A-C Company?

Understandably, no instructions were given as to definitions or standards of injustice or inequity, but the jurors were specifically instructed that they were being asked to find "whether promissory estoppel applies in this case" and whether plaintiffs had "unclean hands" in equity.

The jurors were instructed first to determine the promissory estoppel cause of action and to proceed to a determination of the causes of action for fraud, intentional infliction of emotional distress and wrongful dishonor only if the promissory estoppel cause of action was decided in favor of the plaintiffs, since those causes of action were dependent upon the existence of an enforceable promise.

The jury returned its special verdict on August 2, 1983, finding in favor of the plaintiffs on the promissory estoppel, intentional infliction of emotional distress and wrongful dishonor causes of action, and finding in favor of the Bank on the fraud cause of action. The jury awarded general damages of $250,000 in favor of Conley and $650,000 in favor of the Company, and punitive damages totaling $1 million.

The court denied the Bank's motions for judgment notwithstanding the verdict and for new trial, while expressing reservations about the correctness of allowing the promissory estoppel to be decided by the jury. The court stated, "assuming for these comments that the jury was the appropriate trier of fact, they have ruled on the credibility of the witnesses, that would include the witnesses Mr. Robinson and Mr. Martin and while I don't

wish to opine as to whether my judgment would have been the same in terms of the credibility, it is my strong feeling that where you have eleven or twelve jurors in unanimity or almost unanimity on issues which the law leaves exclusively to them, that those should remain as they are and as the jury so decides."

## III

### Trial of the Equitable Claim of Promissory Estoppel

 Since there was not a contract to extend the notes because the trial court found as a matter of law there was no consideration, plaintiffs' only possibility of establishing an enforceable promise to keep open the alleged offer to extend was by way of the equitable doctrine of promissory estoppel. It was specifically the claim of a promise enforceable by the doctrine of promissory estoppel that plaintiff was asserting and that the court submitted to the jury for decision. This case is directly controlled by the decision of the California Supreme Court in *C & K Engineering Contractors* v. *Amber Steel Co., supra,* 23 Cal.3d 1. There, the court held that where "plaintiff's suit for damages for breach of contract was based entirely upon the equitable doctrine of promissory estoppel [citation], the gist of the action must be deemed equitable in nature and, under well established principles, neither party was entitled to a jury trial as a matter of right." (*Id.,* at p. 5.) The court there defines the elements of the doctrine of promissory estoppel as: "'A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.'" (23 Cal.3d at p. 6; quoting Rest., Contracts, § 90.) It can be seen that the doctrine creates only an enforceable promise, not a contract, since the promisee is not obligated to act or forebear and the promisor has no enforceable contract.

Promissory estoppel has been characterized as a *"peculiarly equitable doctrine* designed to deal with situations which, in total impact, necessarily call into play discretionary powers." (Henderson, *Promissory Estoppel and Traditional Contract Doctrine* (1969) 78 Yale L.J. 343, 379-380.)

 While the right to jury trial is guaranteed by California Constitution article I, section 16, the right so guaranteed is the right as it existed at common law when the Constitution was adopted. (*People* v. *One 1971*

*Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-287 [231 P.2d 832].) If the action is essentially one in equity and the relief sought depends upon the application of equitable doctrines, the parties are not entitled to a jury trial. The fact that damages are sought does not guarantee the right to a jury. (*Southern Pac. Transportation Co.* v. *Superior Court* (1976) 58 Cal.App.3d 433, 437-438 [129 Cal.Rptr. 912].) Even though a complaint purports to seek recovery for damages for breach of contract, where, as here, relief is available only in equity, a jury trial is not available. (*C & K Engineering Contractors* v. *Amber Steel Co., supra,* 23 Cal.3d 1, 9.)

The determination of whether " 'injustice can be avoided only by enforcement of [defendant's] promise' " is a task to be performed by the trial court, sitting as a chancellor in equity, and not by the jury. (*C & K Engineering Contractors, supra,* 23 Cal.3d 1, 11.) The same obviously applies to the application of the doctrine of "unclean hands," as well as the exercise of discretion by the chancellor to limit recovery to that which is "necessary to avoid injustice." (See, for example, *Green* v. *Interstate United Management Serv. Corp.* (3d Cir. 1984) 748 F.2d 827, 830-831.) The tradition and heredity of the flexible equitable powers of the modern trial judge derive from the role of the trained and experienced chancellor and depend upon skills and wisdom acquired through years of study, training and experience which are not susceptible of adequate transmission through instructions to a lay jury.

Plaintiffs argue that *Raedeke* v. *Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665 [111 Cal.Rptr. 693, 517 P.2d 1157], is authority for submission of equity decisions to a jury, but that case was distinguished by the Supreme Court in *C & K Engineering Contractors* v. *Amber Steel Co., supra,* 23 Cal.3d 1, on the ground that in *Raedeke* two causes of action, one legal and one equitable, were submitted to the jurors with the result that resolution of the case did not depend entirely upon the application of equitable principles, and the jurors based their verdict on the legal cause of action. (23 Cal.3d at p. 10.)

It is beyond dispute that where both legal and equitable issues are present, a jury may be empanelled to try the legal issues, and may also at the court's discretion be asked for advisory verdicts as to facts which may apply to the equitable issues, and that the "equity first" rule is the court should resolve the equitable issues first (see *Jaffe* v. *Albertson Co.* (1966) 243 Cal.App.2d 592, 609-610 [53 Cal.Rptr. 25]), and that the court's resolution of the equitable issues may resolve the legal issues. (*Dills* v. *Delira Corp.* (1956) 145 Cal.App.2d 124, 129 [302 P.2d 397].)

It is equally beyond dispute that while a jury may be used for advisory verdicts as to questions of fact, it is the duty of the trial court to make its own independent findings and to adopt or reject the findings of the jury as it deems proper. (*De Arellanes* v. *Arellanes* (1907) 151 Cal. 443, 449 [90 P. 1059].) There is no authority for asking a jury's advice as to "whether injustice can only be avoided by enforcing the promise" or, more generally, whether the equitable doctrines of promissory estoppel or unclean hands should be applied. ■ Here, there is no question the jury decided the equitable action. Its verdict was the basis of the judgment, the court made no findings of its own, and expressly stated it was not announcing any opinions of its own.

Respondents assert the Bank waived its objections to submitting the equitable action to the jury by its failure to move to vacate the setting for jury trial, failure to present the issue at the first opportunity, failure to present the issue to the court after the ruling on the nonsuit, and failure to request a statement of decision. These claims of waiver charitably may be characterized as bordering on the frivolous. The Bank could hardly have moved to vacate the jury trial setting on a claim plaintiffs denied asserting until they had rested their case. The Bank called the court's attention to the nonjury nature of the trial of the equitable issues and action on the first day, the last day and at every opportunity in between. A "statement of decision" is only available where the trial is by the court. (Code Civ. Proc., § 632.) Since the Bank failed to obtain a trial by the court, this claim of waiver is completely without merit.

Finally, respondents meritlessly assert that even if it was otherwise reversible error to permit the jury to try the equity case, it is harmless here because the court was wrong in its finding there was no consideration for a contract, and the jury could have found for the plaintiffs on a contract theory. The first answer to this contention is that even if the court's finding was not correct, the jury did not make any finding of consideration or the existence of a contract, so the speculation they could have cannot cure the error. Further, the court's determination as a matter of law there was no consideration for a promise to keep the renewal offer open the extra two days was not error on these facts. Plaintiffs argue there was consideration in the form of a promise to pay interest at the rate provided in the note, higher than the statutory rate of interest, for the extra days. However, there was no evidence Conley ever made such a promise, the court's inferential finding the interest continued at the specified rate until judgment is a reasonable interpretation of the language of the notes, and the plaintiffs stipulated that the note rate of interest continued until judgment.

## IV

## DISPOSITION

Since the causes of action for wrongful dishonor of checks and intentional infliction of emotional distress were entirely dependent upon the Bank's duties arising from an enforceable promise in equity, all other issues raised in the appeal and cross-appeal are moot because of the necessity to reverse on the equitable claim.

We are compelled to observe that most of the problems with the proceedings in this case are a product of impositions on trial judges which are occurring with increasing frequency. Without a system of enforceable pretrials that define what issues are to be tried and to whom, and with inadequate attention by counsel to the state of the pleadings, cases arrive in the courtroom of the trial judge for a jury trial with a panel of citizen jurors waiting and an expectation by the calendaring system, counsel and all concerned that the trial is to proceed. With trial judges understandably reluctant to delay or to risk denying applications to amend the pleadings, it has become common experience for the courts to be trapped into trials that change their very nature well into the middle of the trial, after jurors have been selected, opening statements made, and evidence presented. Without even considering issues of the parties' reasonable right to know before the trial starts what the issues are, since fundamental decisions such as relevance of evidence must relate to the case pled, the trial judge's chances of avoiding error are seriously impaired.

Reversed and remanded.

Kremer, P. J., and Lovett, J.,* concurred.

A petition for a rehearing was denied October 31, 1985, and the petition of plaintiffs and appellants for review by the Supreme Court was denied February 13, 1986.

---

*Assigned by the Chairperson of the Judicial Council.