[No. B082512. Second Dist., Div. Four. July 23, 2001.]

LAWRENCE SAKS, Plaintiff and Appellant, v.
CHARITY MISSION BAPTIST CHURCH, Defendant and Appellant.

[No. B092393. Second Dist., Div. Four. July 23, 2001.]

CHARITY MISSION BAPTIST CHURCH, Plaintiff and Appellant, v.
LAWRENCE SAKS, Defendant and Respondent.

## COUNSEL

Robert H. Bretz for Plaintiff and Appellant in No. B029393 and for Defendant and Appellant in B082512.

Law Offices of Richard A. Love, Richard A. Love; Love & Shenfeld and Beth A. Shenfeld for Plaintiff and Appellant in No. B082512 and for Defendant and Respondent in No. B092393.

## OPINION

**CURRY, J.**—The dispute underlying this appeal arose out of a series of real estate transactions in which developer Craig Caldwell, one of the defendants below, persuaded respondent Lawrence Saks, M.D., to invest. Dr. Saks's financial involvement with Caldwell began in May 1990 and ended a few months later in August 1990. During that time, Dr. Saks became embroiled in approximately half a dozen land deals and invested over $2 million, over $1 million of which was ultimately lost.

Reverend Sam Steel, Jr., former pastor and president of appellant Charity Mission Baptist Church (the Church), had been involved with Caldwell since 1988 or 1989, lending his name to more than one of Caldwell's development schemes. Reverend Steel, who was also a defendant below, died during trial. Caldwell's appeal was dismissed. The primary issue on appeal concerns whether the Church, the sole remaining appellant, should be held liable for Reverend Steel's actions in support of Caldwell's machinations. Specifically, should the Church be required to pay two promissory notes, one for $575,000 and one for $235,000, signed by Reverend Steel and made payable to Dr. Saks after Dr. Saks advanced $810,000 to purchase property located on Figueroa Boulevard in the Church's name.

Dr. Saks sued the Church under both breach of contract and fraud theories, contending that the Church was liable because Reverend Steel (1) signed the notes in the name of the Church, and (2) induced Dr. Saks to pay the $810,000 to escrow by promising that he and/or the Church would repay it. In its defense, the Church maintains that it was being used by the other three parties as a conduit to obtain a loan or grant from a City of Los Angeles (City) agency. As soon as the anticipated loan or grant was received, the

parties planned to use the City funds to repay Dr. Saks, and then immediately transfer the Figueroa property to a partnership owned by Caldwell, Dr. Saks, and possibly Reverend Steel. The Church believes that because it was never intended to be the true owner of the property or otherwise obtain material benefit from the funds, there is no reason for it to be held liable on the notes, particularly since the property ended up in Dr. Saks's hands after nonjudicial foreclosure.[1] Dr. Saks does not deny that the parties' ultimate goal was to transfer the property to a partnership which excluded the Church, but contends that because things did not work out as planned and the Church retained title to the property after close of escrow, he had the right to enforce the notes in accordance with their terms. After trial, the jury agreed with Dr. Saks, finding in his favor on both breach of contract and fraud theories, and rejecting the Church's defenses.

We believe that where an officer of a corporation is openly using the corporation to obtain a benefit for himself and his cohorts in a transaction, in which the corporation will ultimately not benefit, the other parties to the transaction cannot later seek to hold the corporation liable for his actions. The uncontradicted evidence at trial established that Reverend Steel and Caldwell in their discussions with Dr. Saks made no secret of their plan to use the Church as a front to obtain a loan or grant from a governmental agency. Dr. Saks at no time expressed any disapproval of the plan or unwillingness to participate in the proposed subterfuge. Accordingly, we conclude that substantial evidence does not support the jury's verdict and reverse the judgment.

I

PROCEDURAL BACKGROUND

A. *Dr. Saks's Complaint (Case No. BC025755)*

On April 11, 1991, Dr. Saks filed a complaint naming only Caldwell as defendant, asserting claims for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1961-1967), breach of fiduciary duty, fraud, constructive fraud, conversion, breach of contract, bad faith denial of existence of contract,[2] breach of covenant, money lent, unjust enrichment, and constructive trust. The complaint described a series of investment schemes in which Caldwell persuaded Dr. Saks to participate

---

[1] The $575,000 note was secured by a deed of trust on the Figueroa property.

[2] This claim was later stricken due to change in the law. Also struck were some of the RICO allegations involving Caldwell's guilty plea to making false statements to a bank some years earlier.

during a four-month period in 1990, only one of which is directly pertinent to this appeal. For background purposes, we first briefly summarize the facts pertinent to the prior transactions before turning to the pertinent transaction involving the Figueroa property.

### 1. *Dr. Saks's Prior Transactions with Caldwell*

The first transaction described in the complaint[3] involved a building on Pine Avenue in Long Beach. In May 1990, Caldwell allegedly persuaded Dr. Saks to purchase the second deed of trust for $250,000 without disclosing that the holder of the first deed of trust was attempting to foreclose or that the company which owned the property—Neucada, a corporation owned and controlled by Caldwell—had filed for bankruptcy. Caldwell subsequently persuaded Dr. Saks to reconvey the second deed of trust to be used as a down payment to purchase the building and applied in Dr. Saks's name for a loan to fund the purchase. In August or September 1990, Dr. Saks allegedly learned of the bankruptcy and the threatened foreclosure, and refused to go forward with the purchase. The $250,000 was never repaid.

In May 1990, Caldwell also allegedly induced Dr. Saks to buy real property located on Manchester Boulevard in Inglewood in order to deed it to a partnership to be called Charity Senior Suites for development into senior citizen housing. Dr. Saks took out a second mortgage on his home in order to obtain $1.5 million needed as a down payment and also obtained a bank loan for $1 million. Dr. Saks believed he was purchasing the property from Reverend Steel, but just prior to the sale, Reverend Steel secretly deeded the property to Altamirco, another company owned and controlled by Caldwell, and the money from the sale went to Caldwell and Altamirco. Unaware of this, Dr. Saks deeded the property to the partnership in accordance with the parties' understanding. Caldwell repaid the $1.5 million through Altamirco, which shortly thereafter went into bankruptcy. Dr. Saks was threatened with suit for recovery of the payment as a preference in September 1990.[4] In addition, the lender sought repayment of the $1 million

---

[3]This was apparently not the first dealing between the parties. According to Dr. Saks's amended complaint (discussed further below), in April 1990, Dr. Saks sought Caldwell's advice about a financially distressed athletic club in which Dr. Saks had invested, the Peninsula Athletic Club. Caldwell allegedly persuaded Dr. Saks to transfer 49 percent of his interest in the land and building to Caldwell in return for Caldwell's promise to use his expertise to reduce the club's debt burden and turn the business around. Eventually, Dr. Saks placed the business into bankruptcy, placing his original investment in the business at risk.

[4]The bankruptcy court subsequently ruled that Dr. Saks did not have to repay the funds.

loan from Dr. Saks.[5] In connection with this property, Dr. Saks paid unreimbursed mortgage interest, architectural fees, and development costs totaling approximately $100,000.

In June 1990, Caldwell allegedly persuaded Dr. Saks to pay $50,000 to join in the purchase of property on Seville in Huntington Park on which Caldwell said he planned to build senior housing. In addition, Dr. Saks paid Caldwell $37,625 for a share of development costs in connection with that transaction. Caldwell allegedly told Dr. Saks that Dr. Saks's name could not be listed as a buyer as this would require a change in escrow instructions and risk loss of the deal. Later, Caldwell "falsely claimed that Saks's $87,625 was a personal loan to Caldwell" and that "Saks [had] no interest in the Huntington Park property and that he never agreed to develop the property with Saks."

### 2. *The Figueroa Property Transaction*

According to the complaint, the Figueroa property was brought to Dr. Saks's attention in July or August 1990. Caldwell allegedly invited Dr. Saks to participate on the following basis: First, Reverend Steel and the Church would purchase the property from Community Baptist Church (CBC); then Reverend Steel "who [was] under Caldwell's control," would "transfer the property to a partnership in which Saks and Caldwell would be partners." The complaint contended that Dr. Saks was to provide $235,000 for the down payment through an "unsecured note from Reverend Steel and [the Church]." An additional $575,000 would be provided and secured by a note and deed of trust on the property. According to the complaint, "Caldwell told Saks that the $575,000 loan would be repaid to Saks one month after the close of escrow." Caldwell further allegedly told Dr. Saks that "he [Caldwell] would be responsible for repayment of Saks's $810,000 in loans for the purchase of the property."

Caldwell and Reverend Steel both allegedly told Dr. Saks "that the City of Los Angeles had already approved a loan for $575,000 to buy and develop the property[] . . . [,] that the loan had been in favor of P&P Home for the Elderly" and "that the city was in the process of transferring the loan papers from P&P to the name of Reverend Steel and [the Church]." Caldwell alone allegedly told him "the process would be completed within a month of the close of escrow." Caldwell also allegedly told Dr. Saks "that he would make the payments on the $235,000 note from Reverend Steel and [the Church] to Saks, which would be repaid in full by August, 1991." No payments had been made on either note, resulting in a loss of $810,000.

---

[5]Ultimately, the lender foreclosed on the property without seeking a deficiency from Dr. Saks.

B. *Caldwell's Cross-claim*

Caldwell filed a cross-claim against Dr. Saks[6] alleging that Dr. Saks had reneged on a promise to buy the Long Beach building for $3.35 million causing the property to be lost to the first trust deed holder; failed to make lease payments owed by the Peninsula Athletic Club to the partnership comprised of the two men; and otherwise breached various agreements between them.

C. *The Church's Complaint (Case No. BC027875)*

On May 9, 1991, a complaint in a separate lawsuit was filed by the Church and Reverend Steel as plaintiffs, naming Dr. Saks as defendant, asserting claims for breach of contract, equitable estoppel, declaratory relief, injunction, and reformation.[7] The breach of contract claim alleged that in August 1990, "[p]laintiffs" entered into a partnership agreement with Caldwell for the purchase of real property. According to the complaint, Dr. Saks and Caldwell were to own a 40 percent interest each in the partnership under this agreement, while "[p]laintiffs" were to own the remaining 20 percent. According to the complaint, with respect to the Figueroa property, the Church purchased it from CBC for $1,050,000. Plaintiffs executed a note secured by a deed of trust to secure the amount of $240,000 in favor of CBC. The Community Redevelopment Agency (CRA) had purportedly earmarked a grant of $1.02 million for the development of the property into a senior citizens home. Dr. Saks was to advance the Church money to purchase the property in the following manner: $235,000 was to be given to the Church as a tax deductible charitable contribution and $575,000 was to be lent to the Church and repaid after CRA funds became available. On August 14, 1990, the parties executed a written note and deed of trust in favor of Dr. Saks securing the sum of $575,000.

In February 1991, Dr. Saks gave notice of default and intent to sell the Figueroa property by nonjudicial foreclosure. The complaint alleged that this constituted breach of agreement in that the understanding of the parties was that the note was not to be due until 30 days after funding by the CRA. The complaint sought reformation of the note to reflect this understanding and an injunction preventing the foreclosure from going forward. The complaint also sought to equitably estop Dr. Saks from taking action until after the CRA payment and declaratory relief had sorted out the parties' respective rights and duties and determined the validity of the alleged agreement.

---

[6]Some of the cross-claims were actually alleged by the entities owned and/or controlled by Caldwell (Altamirco and Neucada), and some named additional defendants such as Dr. Saks's wife. Because these distinctions do not matter to any of the issues before us, we will ignore those parties and refer to the claims as being between Dr. Saks and Caldwell.

[7]The two cases were eventually consolidated.

### D. *Dr. Saks's First Amended Complaint*

In apparent reaction to the Church's complaint, Dr. Saks filed a first amended complaint (FAC) on August 30, 1991, adding Reverend Steel and the Church as defendants. The following new allegation was contained in the FAC: "Although Caldwell originally told Saks that Steel and [the Church] would not be partners, Caldwell later told Saks that Steel and [the Church], who [we]re under Caldwell's control, would be partners."

The promissory notes were not the basis of any claim in the original complaint. In the FAC, the breach of contract cause of action included the allegation that Dr. Saks agreed to lend "and Steel and [the Church] agreed to borrow" $235,000 on an unsecured promissory note bearing interest at the rate of prime plus 2 percent and due August 13, 1991, and $575,000 on a promissory note bearing 10 percent interest and due September 27, 1990, toward the purchase of the Figueroa property "for defendants' benefit." The FAC further alleged that Reverend Steel and the Church were in default of their obligations under the $235,000 note "in that they have anticipatorily breached their obligations by stating that they have no intention of fulfilling those obligations. . . . [¶] . . . Steel and [the Church] filed a complaint in the Superior Court . . . alleging that they were not obligated to repay, and had no intention to repay, the $575,000 loan or the $235,000 loan unless and until the [CRA] someday funds a grant to defendants for the Figueroa property."

In the fraud cause of action, the FAC alleged that "defendants" obtained the funds used to purchase the Figueroa property by "falsely representing that [CBC] was the owner of the property, by concealing the existence of two prior lis pendens, by falsely stating that Caldwell would repay Saks's loan to Steel, and by falsely stating that they had arranged a loan from a government agency, which would repay Saks's loans." (Underscoring omitted.) Dr. Saks stated in the FAC that "defendants," presumably meaning both Caldwell and Reverend Steel, had represented to Dr. Saks that the process of obtaining City funds would be completed within a month after close of escrow. Previously, Dr. Saks had attributed this statement to Caldwell alone.

## II

### TRIAL

### A. *Testimony*

The legal and equitable issues were bifurcated, and the legal issues tried to a jury in May and June 1993. Dr. Saks was the primary witness at trial on

liability issues. Because we are required to evaluate the evidence in favor of the prevailing party, we concentrate on his testimony rather than that of the defendants.

Concerning his relationship with Caldwell, Dr. Saks testified that he met Caldwell in 1984 while treating Caldwell's family in his medical practice. Caldwell was also a neighbor and social acquaintance. He appeared to be very wealthy and successful. On one occasion, Caldwell told Dr. Saks he was making $70,000 to $100,000 per month through various business dealings, which included operating a mortuary chain and buying troubled businesses out of bankruptcy.

### 1. Prior Transactions

#### a. Peninsula Athletic Club

In 1989, before becoming involved with Caldwell, Dr. Saks bought the Peninsula Athletic Club, in part through a note secured by a deed of trust. In April 1990, Dr. Saks told Caldwell that he was having tax problems[8] and financial problems with the athletic club. Caldwell offered to take over operations of the athletic club, and renegotiate the note. Caldwell was made a partner in an agreement signed by the parties, but told Dr. Saks that he would not take any money out of the business unless he was successful in lowering the amount due on the note. Caldwell advised Dr. Saks to stop paying on the note, which eventually caused the holder to foreclose.

#### b. La Brea Property

While this was going on, Caldwell persuaded Dr. Saks to invest in two separate land ventures involving property located on La Brea and Manchester. Reverend Steel was, at least nominally, a part owner of the La Brea building, and Caldwell introduced Dr. Saks to Reverend Steel in connection with the La Brea transaction. They met at the mortuary operated by Reverend Steel on the Manchester property, and drove to look at the La Brea property. Dr. Saks did not have any substantive discussions with Reverend Steel in connection with the transaction. Dr. Saks was essentially told by Caldwell that Dr. Saks's credit would be used to obtain loans so that entities in which he and Caldwell held interest could be used to purchase the properties. Caldwell told Dr. Saks that he had some problems with "City Hall" and it would be better if his name was not included. After the sale on the La Brea property closed, Dr. Saks was shown as a 95 percent owner of the partnership that owned the property and Reverend Steel a 5 percent

---

[8] Dr. Saks ultimately pled guilty to tax fraud.

owner. Later, 55 percent of the partnership was transferred to Caldwell. Dr. Saks suffered no losses as the result of the La Brea transaction.

### c. *Manchester Property*

To purchase the Manchester property, Caldwell borrowed $1.5 million from Dr. Saks, which Caldwell repaid a few days later through Altamirco. Dr. Saks also signed the promissory note for a $1 million bank loan. The seller of the property was identified as Reverend Steel, although Caldwell told Dr. Saks that he (Caldwell) controlled it. The buyer was identified as Dr. Saks. Per the parties' understanding, Dr. Saks immediately transferred the property to the Charity Senior Suites partnership, comprised of himself and Altamirco. Dr. Saks paid Caldwell approximately $33,000 for expenses incurred by the partnership and made one or two mortgage payments totaling $17,452 before the property was lost to the lender. He spent $95,000 in attorney fees defending his right to the $1.5 million repaid to him against a bankruptcy preference claim.

### d. *Long Beach Building*

After these deals were underway, Caldwell presented the Long Beach building, telling Dr. Saks that he had negotiated the second trust deed down to $250,000 and wanted Dr. Saks to purchase it. Caldwell said the money would be paid back in two or three months along with a very high amount of interest. Dr. Saks gave Caldwell a check for $250,000, but never got a signed agreement for repayment. Caldwell had the second trust deed assigned to Dr. Saks. Caldwell did not tell him the first trust deed holder was foreclosing or that the entity that owned the building was in bankruptcy. Caldwell then proposed that Dr. Saks use the trust deed as a down payment on the property. Dr. Saks signed escrow instructions stating that he was going to buy the building for $3.35 million. Dr. Saks never received repayment of the $250,000 spent on the note.

### e. *Seville Property*

Caldwell next got Dr. Saks involved in a property on Seville in Huntington Park. Caldwell said he intended to build a small shopping center and senior citizen housing on the site. Dr. Saks gave Caldwell $50,000 towards the purchase of the property and another $37,000 to cover disbursements for the proposed development. Caldwell did not add Dr. Saks's name to the escrow as a purchaser, claiming that any changes would cause the sale to fall through. The sale did not take place, but none of the money was repaid.

### 2. *Figueroa Property*

Around the end of July, Caldwell started talking to Dr. Saks about the Figueroa property. Caldwell told him that the property had been earmarked

for a loan by the City for $575,000 which would go to the developer to help pay for the land. The approval for the loan was in the name of another church, and Caldwell was reportedly working on getting it transferred. A few weeks later, Caldwell told Dr. Saks there would be $575,000 in City funds available to a nonprofit organization. Caldwell initially assured Dr. Saks that if he lent $575,000 towards purchase of the property, it would be returned in 30 to 120 days, and the other $240,000 or $235,000 would be repaid when the construction loan funded. In a later conversation, Caldwell told Dr. Saks that he would get the $575,000 back in 30 days, and the rest of the money in six to 12 months. Caldwell showed Dr. Saks a letter from the City approving a loan for the site. Caldwell assured Dr. Saks that he would personally be investing $240,000 in the purchase. There were no discussions about what would happen if the City did not fund the grant or loan.

After a few more meetings with Caldwell, Reverend Steel showed up at Dr. Saks's office to pick up the $235,000 check and sign the $235,000 note. At that time, Reverend Steel either acknowledged that the money had to be repaid in a year or said he would pay the money in a year. This was only the second time Dr. Saks recalled having any interaction with Reverend Steel. A few days after that, Caldwell called and asked for the $575,000. Dr. Saks testified initially that he could not remember whether he gave the second check, made payable like the first to Valley Escrow, to Caldwell or Reverend Steel. Later, he testified that Reverend Steel came to pick up the check and stated at that time that the note would be paid in 30 days but admitted having trouble recalling for sure whether that event occurred. Still later, he testified that Reverend Steel definitely came to pick up the $575,000 check and told Dr. Saks that he and the Church would pay the money in 30 days. That was the last conversation Dr. Saks had with Reverend Steel until sometime after escrow closed.

During cross-examination, it was brought out that at his deposition, Dr. Saks had testified as follows concerning the Figueroa transaction: "The deal was I would have to—I would loan—well, it's really not a loan. I would deposit or I would invest $235,000 to Reverend Steel and his church and that would be repaid when another grant would be received by the reverend and Mr. Caldwell. . . . And if you read the notes there's a pledge to pay it back in three to six months, to pay half of the money back, [$]117,000 in three to six months when a secondary loan on the project was obtained, and then the other $117,500 would be paid back when a construction loan to build the building would be negotiated which would probably take a year." When the deposition was given to him for review, he struck the phrase "Well, it's really not a loan," explaining at trial that what he had said was a mistake and that it really was a loan to the Church rather than an investment in the partnership.

Dr. Saks testified he had an oral agreement with Caldwell which encompassed buying the land. He testified to the following terms: "The deal was when he [Caldwell] first brought it to me that we would be partners in developing the property. Before we got to be partners in developing the property I would have to loan the [$]575, loan the [$]235. He would loan [$]240. We'd get most of that money back and then in six to 12 months we would have a partnership to do the construction loan where me and Mr. Caldwell would be 50/50 partners in the profits of the construction and the development . . . ." Dr. Saks admitted that his response to Caldwell's proposal did not indicate disagreement with any aspect of it: "I didn't object to it. I said yes, I didn't object to it."

Dr. Saks further explained at trial that he did not believe there was an agreement whereby the ownership of the Figueroa property would be split between him, Caldwell, and Reverend Steel because the existence of such an agreement was contingent on his getting repaid the $575,000. In his own words: "We would build out the project, and when we would build out the project which was six, 12 months down the line, then the reverend would have 20 percent and it would be transferred into a partnership with the 40/40/20 but in this time in August none of those things will happen because the first part of the transaction never completed. I never got the [$]575 back . . . ." Dr. Saks further testified that when Caldwell brought up the subject of Reverend Steel being given an interest, it would be, "I don't know, one, two, three years later." Reverend Steel "would be partner when the loans were paid off, the [$]575 was paid off. Then we'd get a partnership, and we do some construction, and then we'd have a building and Steel would run it, then he'd be a 20-percent partner." Dr. Saks denied that they reached an agreement that this three-way partnership, when it came into existence, would be called Charity Senior Suites, after the Church.

Dr. Saks was clear in his testimony that the Church was never supposed to be part of any partnership, and that its name was added in order to obtain a City funded loan or grant: "Originally, when we started talking it was Caldwell and I to . . . buy the land . . . . and then he said . . . we need to put it in the name of [the Church] because . . . they were transferring that loan from the City or the CRA or the CDD . . . from one church to another and that's why the church was buying the property."

Because the $575,000 note was secured by the Figueroa property, Dr. Saks was able to foreclose on the property through nonjudicial foreclosure in September or October 1991, bidding $737,000 at the trustee's sale. He still owned the property at the time of trial.

Dr. Saks never met anyone associated with the Church other than Reverend Steel and possibly his wife. He had never been to the Church. He

attested to his understanding that Reverend Steel was a pawn for Caldwell and that Caldwell was the decision maker on all the transactions.

Reverend Steel testified that there had been a meeting with Dr. Saks at a restaurant in the summer of 1990. At that meeting, the details of the partnership were discussed and orally finalized, including an agreement that the obligation on the notes was conditional on receipt of City funds. Dr. Saks denied categorically that such a meeting had taken place or that such a promise had been extracted from him.

### B. *Motion for Nonsuit*

At the close of Dr. Saks's case, the Church moved for nonsuit on the RICO and fraud claims. The court granted the motion. The court stated at that time: "I don't think the [C]hurch committed any fraud on Saks. Steel did it all. If there's any fraud or any acts or any misdeeds, Steel did them all." The next day, according to the court's minute order, the Church's motion with respect to the fraud cause of action was withdrawn.[9]

Dr. Saks then recalled Reverend Steel, who testified that the Church was a nonprofit corporation and that he was the president. He also testified there were nine deacons who functioned as the board of directors. He never obtained the approval of the board or the other officers to get involved with the Figueroa property transaction or any of the other transactions. He told the parishioners only that there would be a senior citizens project named after the Church. When asked why he had not sought the necessary approval or informed anyone of what he was doing, he testified it was because the Church "wasn't the one who was really purchasing the land, the partnership was the one." His understanding was the land was never going to belong to the Church, and that the Church was involved in the transaction because of its name and nonprofit status.

### C. *The Special Verdict*

The jury was instructed on RICO, fraud (misrepresentation, intentional concealment, and negligent misrepresentation), breach of contract, breach of fiduciary duty, conversion, and money had and received.

---

[9]There is no reporter's transcript for that day. As we will see, the Church contends that it was persuaded to withdraw the motion by assurances from the trial court that it would grant posttrial motions for new trial or judgment notwithstanding the verdict (JNOV) if need·be.

The jury found by special verdict that all defendants—Caldwell, Reverend Steel, and the Church—violated RICO.[10] The jury awarded damages of $1,637,970, and further found that $747,500 of that amount was attributable to losses on the $575,000 note secured by the trust deed.

On Dr. Saks's claims of fraud, damages of $584,970 were assessed against Caldwell; damages against Reverend Steel and the Church were assessed at $1,053,000. The jury further found that all defendants breached a fiduciary duty owed to Dr. Saks, and awarded damages in the same amount as were awarded on the fraud claims.

On the claim for money had and received, the jury found that Caldwell received $388,712, and Reverend Steel and the Church received $810,000. The jury found that Reverend Steel and the Church had not converted any funds belonging to Dr. Saks, but that Caldwell had converted $388,712. The jury found the defendants liable for breach of contract, awarding $584,970 as to Caldwell, and $1,053,000 as to Reverend Steel and the Church.[11]

Finally, the jury found for Dr. Saks and against the plaintiffs on all of the claims and cross-claims against him, finding specifically that both Reverend Steel and the Church were liable on the two promissory notes. As will be discussed further in part III.D. *post*, the trial court, in postverdict proceedings, granted JNOV to the Church on the RICO claim, denied JNOV to the Church on the fraud claim, and granted the Church's motion for new trial unless Dr. Saks agreed to a remittitur reducing damages to $305,500. Dr. Saks agreed to the remittitur. The Church filed a notice of appeal on March 7, 1994.[12] Judgment in favor of Dr. Saks was entered in accordance with the court's ruling on the Church's equitable claims on February 21, 1995, and the Church noticed a second appeal. We consolidated the two appeals.

## III

### Discussion

■ Although the Church contends in its brief on appeal that numerous procedural and substantive errors marred the judgment, the most significant issue concerns whether substantial evidence supports the jury's finding that

---

[10]Why the Church was included as a defendant on the special verdict form on the RICO cause of action after its motion for nonsuit had been granted is not clear.

[11]The difference between the $810,000 and $1,053,000 was presumed by the parties to represent accrued interest on the notes.

[12]Caldwell and his related entities were also named in that notice of appeal. His appeal was dismissed. Dr. Saks cross-appealed on the JNOV granted in favor of the Church on the RICO claim only. That appeal was subsequently withdrawn.

the Church was obligated to pay the notes under either a breach of contract or fraud theory. Because we believe the jury's verdict was unsupported by the evidence, we need not address the remaining issues asserted in the brief.

### A. *Breach of Contract*

■ When a disputed factual matter is resolved by the jury, the appellate court reviews the determination under the substantial evidence rule. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, . . . If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion. [Citations.]" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925], italics omitted.) Substantial evidence is evidence " 'of ponderable legal significance, . . . reasonable in nature, credible, and of solid value.' [Citations.]" (*Id.* at p. 873, italics omitted.) It is not synonymous with any evidence. (*Ibid.*)

We begin our analysis of whether substantial evidence supports the jury's finding of liability on the breach of contract action by pointing out that a promissory note is a form of negotiable instrument—an unconditional promise to pay money signed by the person undertaking to pay, payable on demand or at a definite time. (See Cal. U. Com. Code, § 3104 and Cal. U. Com. Code com. 1, reprinted at 23B West's Ann. Cal.U. Com. Code (2001 supp.) foll. § 3104, p. 8.) A promise to pay money contained in a note is legally binding in accordance with the established rules governing negotiable instruments contained in article 3 of the California Uniform Commercial Code. Unlike a contract, a note is one sided: it tells us what the promisor is obligated to do (pay a certain sum of money on demand or by a certain date) but does not indicate what the payee has done or undertaken to entitle it to the promised payment. In a commercial setting, the payee's promise or obligation is often the subject of a separate agreement which can be oral or written. It is therefore not surprising that under the California Uniform Commercial Code, a note is subject to the defense that a separate agreement between the obligor and the person entitled to enforce the instrument has "modified, supplemented, or nullified" the obligation to pay where "the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement." (Cal. U. Com. Code, § 3117.) According to the comments to this provision, "[t]he

separate agreement . . . might be an agreement that contradicts the terms of the instrument. For example, a person may be induced to sign the instrument under an agreement that the signer will not be liable on the instrument unless certain conditions are met." (Cal. U. Com. Code com. 1, 23B West's Ann. Cal. U. Com. Code, *supra*, foll. § 3117, p. 24.)[13]

■ In addition, negotiable instruments are subject to the defense of failure of consideration. (Cal. U. Com. Code, § 3303, subd. (b).)[14] " 'A promissory note is presumed to have been given for a sufficient consideration . . . and in an action thereon, the introduction of the note in evidence establishes a *prima facie* right to recover according to its terms. The burden of showing a want of consideration . . . is cast upon the party seeking to avoid it, and if he fails to make this showing, the presumption prevails and furnishes sufficient evidence to support a finding that the note was given for a good and valuable consideration.' " (*Meyer v. Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 258-259 [54 Cal.Rptr. 786].) At the same time, " '[t]he absence of consideration is always a defense to a suit on a promissory note [citation] and since an instrument lacking in consideration is invalid, this fact may be shown by extrinsic evidence. [Citations.]' Where the evidence produced by the plaintiff reflects the absence of consideration it is proper to grant a nonsuit. [Citation.]" (*Id.* at p. 259; accord, *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 397 [282 Cal.Rptr. 508] ["[A] general denial puts in issue the question whether consideration was given for the note which recites that it was given for valuable consideration. [Citation.] Such a defense, because it challenges a facial claim of the note, is not subject to the parol evidence rule."].)[15]

---

[13]The statute goes on to state that this rule is subject to the parol evidence rule, which the statute characterizes as "applicable law regarding exclusion of proof of contemporaneous or previous agreements . . . ." (Cal. U. Com. Code, § 3117.) Comment 2 explains that the parol evidence rule applies where the instrument purports to be fully integrated, "[t]he effect of merger or integration clauses to the effect that a writing is intended to be the complete and exclusive statement of the terms of the agreement or that the agreement is not subject to conditions is left to the supplementary law of the jurisdiction . . . ." (Cal. U. Com. Code com. 2, reprinted at 23B West's Ann. Cal. U. Com. Code, *supra*, foll. § 3117, p. 24.) Neither of the notes before us contained an integration clause.

[14]Because we are here dealing with the original payee, we do not have to concern ourselves with the limitations on defenses available against the claims of a holder in due course. (See Cal. U. Com. Code, § 3305, subd. (b).)

[15]One of the numerous issues raised on appeal is whether the trial court erred in refusing to grant a motion to amend the complaint "to conform to proof" by raising an equitable defense or a sham transaction defense to the $235,000 note. Since a general denial puts in issue whether the note was supported by consideration, the trial court's refusal to allow the Church to amend its answer to assert an affirmative defense to the $235,000 note or its complaint to assert a claim for reformation of the $235,000 note had no impact on the Church's ability to assert the defense of lack of consideration.

A note may also be subject to the defense that it was intended to be "void, i.e., a sham not intended between [the parties] as a jural act." (*FPI Development Inc. v. Nakashima, supra*, 231 Cal.App.3d at p. 401.) This defense is also exempt from the proscriptions of the parol evidence rule; however, it must be pled as an affirmative defense and is not encompassed in a general denial. (*Id.* at pp. 401-403.)

 Our review of the record reveals that the Church attempted, somewhat inartfully, to establish all three defenses: (1) that there was a separate agreement under which the obligation of any party to pay the notes was conditional on receipt of a loan or grant from the City; (2) that there was no consideration flowing to the Church from the parties' agreement or the money loaned by Dr. Saks; and (3) the notes were a sham, put together in order to fool the City, intended to have no legal impact as between the parties.

Concerning the condition precedent defense, Dr. Saks denied that he had agreed to forego repayment until a loan or grant could be received and further denied that there had been any discussion between the parties concerning what would happen if the City funding did not materialize within 30 days. Apparently no such discussions seemed necessary because, as Dr. Saks further testified, he had been led to believe by Caldwell that the City funding was a certainty due to the fact the City had already approved funding to build senior citizen housing for the prior owner. Dr. Saks was persuaded that it would be a simple matter to transfer the approval to the Church when it became the titular owner. The defense disputed this evidence, testifying that at a face-to-face meeting at a restaurant in 1990, the parties orally agreed to forego repayment until after the City funded the loan or grant. Dr. Saks denied that such a meeting occurred or that such a promise was extracted from him at any time. His testimony provided substantial evidence that there was no condition precedent and supported this aspect of the jury's finding.

This evidence does not, however, resolve the Church's separate defense that there was no consideration given to the Church in exchange for the promise to pay contained in the notes, and that all expected benefits flowed to Caldwell, Dr. Saks, and possibly Reverend Steel. The uncontradicted testimony established that the expressed intent of the parties to the transaction was to put title to the property in the Church's name for only as long as was needed to persuade the City to fund a grant or loan. If all went according to plan, Reverend Steel, acting under the control of Caldwell, would then immediately transfer the grant or loan money to Dr. Saks and transfer the property to a partnership. There was a dispute about whether Reverend Steel would or would not be part of the partnership along with Caldwell and Dr.

Saks; there was no dispute that the Church itself would end up with no interest in either the property or the partnership. Dr. Saks was particularly adamant in this regard, testifying that the parties had not even agreed to use the Church's name in connection with the proposed partnership.[16]

As we understand his theory, Dr. Saks believes that although the parties' ultimate plan was to transfer the property from the Church to the Saks/ Caldwell partnership (or Saks/Caldwell/Steel partnership), because that never occurred due to the City's failure to fund and the parties' subsequent falling out, the Church should be held liable on the notes as if this were a straightforward loan transaction. This line of reasoning has a certain superficial appeal. The Church did end up with title to valuable property paid for by Dr. Saks's money. ■ It overlooks a basic principle of contract law: " '[T]he consideration for a promise must be an act or a return promise, *bargained for and given in exchange for the promise*. [Citations.] In the words of section 75 of the Restatement of Contracts (com. b): "Consideration must actually be bargained for as the exchange for the promise . . . The existence or non-existence of a bargain where something has been parted with by the promisee or received by the promisor depends upon the manifested intention of the parties. . . . *The fact that the promisee relies on the promise to his injury, or the promisor gains some advantage therefrom, does not establish consideration without the element of bargain or agreed exchange*." [Citation.]' " (*Meyer v. Glenmoor Homes, Inc. supra*, 246 Cal.App.2d at p. 259, italics added.)

The facts in *Meyer* aptly illustrate this principle. The plaintiff's deceased husband had been a director and co-owner of the defendant corporation along with two other individuals. A parcel of property formerly owned by the corporation had been transferred to the three individual owner/directors who wished to obtain a loan on the property. In order to accomplish this, they needed quitclaim deeds from their spouses. The plaintiff's husband, to persuade her to sign the quitclaim deed, gave her a note for $25,000 purporting to be from the corporation. The other directors did not discover the existence of the note until after death of the plaintiff's husband when the plaintiff sought to collect on the note. At trial, the plaintiff conceded that the quitclaim deed she was persuaded to sign named her husband and his two associates as the grantees rather than the corporation. (*Meyer v. Glenmoor Homes, Inc. supra*, 246 Cal.App.2d at p. 257.) Nevertheless, she believed the corporation should be held liable because "decedent represented the deed was for the corporation" and because "she offered to sign [the quitclaim

---

[16]In view of this testimony, it is somewhat surprising to see in the respondent's brief the argument the Church received consideration because the development would be used to "spread the name of the Church."

deed] if the corporation would give a note for her interest." (*Id.* at p. 258.) The court concluded that these facts would be material on the question of ostensible agency and equitable estoppel, "but do not show, in the absence of authority in the decedent, that the corporation in fact bargained for the conveyance that was made." (*Ibid.*)

The plaintiff in *Meyer* also sought to predicate the existence of consideration for the note on the incidental benefit to the corporation from a contract it later entered into with the three individuals to construct an apartment building on the land in question. (*Meyer v. Glenmoor Homes, Inc. supra*, 246 Cal.App.2d at p. 258.) The court disagreed. Although admittedly the loan obtained by the individuals was "a 'take-out' loan to replace the short term bank financing for construction with a permanent loan," there was "nothing to show that defendant corporation bargained for or received any of the proceeds of the loan that was obtained by the individual grantees." (*Ibid.*) Thus, the court concluded: "Plaintiff's attempts to show that the defendant [corporation] bargained for the detriment which she allegedly suffered founders on the lack of authority of the decedent to pledge the corporate credit and assets to pay for a conveyance to himself and others individually for their sole benefit." (*Id.* at p. 260.)

 Similarly, there was no evidence presented at the underlying trial that the Church received any of the $810,000, or that Reverend Steel or anyone else purporting to act on behalf of the Church expressed a desire on the part of the Church to receive ownership of the Figueroa property in return for a $810,000 loan from Dr. Saks.[17] The uncontradicted testimony from all of the parties involved in the discussions was that the Church's name was put on the title in lieu of the names of the true owners—Caldwell, Dr. Saks, and possibly Reverend Steel—because a nonprofit organization was necessary to their plan to obtain a City loan or grant. According to the evidence, Dr. Saks was induced to enter into the agreement by Caldwell's assurances as to the certainty of the City funding the project. There was no discussion of what would occur if the City failed to fund, and certainly no agreement that, if that turn of events came to pass, the Church would keep the property and pay off the notes from its meager resources. Given the nature of the discussions between the parties, no one involved in the transaction had any grounds for believing that the Church was bargaining for an interest in the ownership or a right to develop the Figueroa property on its own.

---

[17]Indeed, the evidence is clear that Dr. Saks barely discussed the Figueroa transaction with Reverend Steel. His only interaction with Reverend Steel occurred when Reverend Steel came to pick up the $235,000 check, and possibly the $575,000 check, after Caldwell had outlined the parameters of the agreement and received Dr. Saks's assent to go forward.

Dr. Saks may well have been fraudulently induced to enter into the deal by Caldwell's false assurance that City funding was a sure thing and would definitely happen within 30 days. But his remedy for this wrong is to recover from the party who induced him to part with his money by virtue of an overly optimistic prediction of the future. He cannot force the Church to pay for property it never sought to own. We conclude that the uncontradicted evidence established the Church's defense to the breach of contract action that the notes lacked consideration.[18]

### B. *Fraud*

 The jury awarded damages identical to the amount awarded for breach of contract on Dr. Saks's fraud claim against the Church. The only misrepresentations attributable to the Church were statements made by Reverend Steel to the effect that the notes would surely be paid off within 30 days. We now examine whether due to the position of authority bestowed on Reverend Steel by the Church, the Church should be held liable for his actions in encouraging Dr. Saks to go through with the Figueroa transaction and assuring him that the money was available and would be repaid within the time specified on the notes. The doctrines of respondeat superior, ostensible authority, or equitable estoppel could provide a ground for imposition of liability on a fraud theory.[19] (See *Meyer v. Glenmoor Homes, Inc. supra*, 246 Cal.App.2d at p. 258; *Rutherford v. Rideout Bank* (1938) 11 Cal.2d 479 [80 P.2d 978, 117 A.L.R. 383] [employer may be liable for fraud of employee acting in accordance with the general scope of his duties even if the employer receives no benefit and the employee was acting solely for his own purposes].)

 Ostensible authority and equitable estoppel are proven in the same manner: " 'The California cases hold that under [Civil Code] sections 2317

---

[18]The same uncontradicted evidence would likely also support the Church's sham transaction defense, but in view of our conclusion concerning the lack of consideration, we need not consider the sham transaction defense or whether the trial court erred in failing to allow an amendment to assert it.

[19]Dr. Saks contends in his brief that the Church should be held accountable because it ratified Reverend Steel's conduct after-the-fact by: "signing several documents pertinent to Steel's transactions with Saks; taking the distribution of the funds from escrow and providing them to Caldwell; representing to the [City] in its application for a grant that Saks had 'loaned' the funds; and asserting ownership over the property." (Fn. omitted.) According to the evidence, all of these actions were undertaken by Reverend Steel personally. An agent cannot ratify his own improper actions. As we will see, even the Church's *complaint*, which sought an injunction preventing the foreclosure until the rights of the parties could be sorted out, was filed without knowledge of the other officers and directors.

and 2334,[20] a plaintiff cannot recover on the basis of ostensible authority without a showing of facts sufficient to raise an estoppel [citations]. . . . "[I]ts essential elements are representation by the principal, justifiable reliance thereon by the third party, and change of position ·or injury resulting from such reliance." [Citation.]' " (*Meyer v. Glenmoor Homes, Inc., supra*, 246 Cal.App.2d at p. 262.) Under the doctrine of respondeat superior, "an employer is vicariously liable for the torts of its employees committed within the scope of the employment." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296 [48 Cal.Rptr.2d 510, 907 P.2d 358].) Dr. Saks contends that by placing Reverend Steel in his position as pastor and president, the Church cloaked him with ostensible authority and justified Dr. Saks's reliance on Reverend Steel's assurances that the notes would be paid. Alternatively, Dr. Saks believes the Church should be held liable under the doctrine of respondeat superior.

The court in *Meyer* examined whether to apply the doctrines of ostensible authority or equitable estoppel where the party who gave the supposed corporate note to the plaintiff was a director and co-owner of the corporation, but the act undertaken by the plaintiff—signing a quitclaim deed in favor of the corporate directors as individuals—clearly benefited the individuals only. The court noted: "The whole of the evidence disclose[d] not only a situation where there was no actual authority or authority implied in fact, but also a transaction, which because it purported to obligate the corporation to pay a debt incurred personally by its officer and director, could not be ratified by the corporation" (*Meyer v. Glenmoor Homes, Inc., supra*, 246 Cal.App.2d at p. 261), and applied the following rule: " '. . . "An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal." (Civ. Code, § 2306.) A corporation is not chargeable with the knowledge of an officer who collaborates with an outsider to defraud it. . . .' " (*Meyer v. Glenmoor Homes, Inc., supra*, at p. 264.)

This describes the situation before us. According to his own testimony, Dr. Saks was told in no uncertain terms by Caldwell that the sole point of putting the property in the name of the Church was to obtain funds from the public treasury, and that as soon as the funds were secured, title would be transferred to a private partnership. Dr. Saks was also bluntly informed that Caldwell controlled Reverend Steel and that Reverend Steel would do

---

[20]Section 2317 of the Civil Code provides: "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Section 2334 provides: "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof."

Caldwell's bidding in this regard. Dr. Saks was familiar with this manner of doing business because in the earlier transaction involving the Manchester property, Dr. Saks's name was used to purchase the property, and it was thereafter transferred to a partnership in which Caldwell held an interest. Dr. Saks may have been unaware of the lawfulness or unlawfulness of the proposal to obtain public funds through a false front,[21] but he was clearly not ignorant of the ultimate goal of the parties' pact: to benefit the individuals through use of the Church's name. The fact that he remained silent during his conversations with Caldwell, neither expressing approval nor disapproval, and accepted the notes from Reverend Steel without comment, does not transform Dr. Saks from a coconspirator into an innocent commercial lender. By his own admission, he acquiesced in a scheme to wrongfully use the name of an eleemosynary corporation to obtain financial benefit for himself and his partner(s). The mere fact that the plot was unsuccessful does not justify transferring the financial burden of the scheme to a charitable corporation which stood to gain nothing from it.

The same analysis precludes application of respondeat superior liability. Dr. Saks knew that the Figueroa property was being purchased for the exclusive benefit of himself and the other individuals, including potentially Reverend Steel. Under California law, the employee's motive to benefit himself personally rather than the corporation is one factor, albeit not the determinative factor, in the application of respondeat superior. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital, supra*, 12 Cal.4th at p. 297.) The general rule we apply is that the tort must foreseeably arise from the employee's duties. (*Id.* at p. 299.) In the situation before us, because Reverend Steel was openly acting for the benefit of himself and the other individuals involved, it should have been obvious to all concerned that his actions did not arise from his normal conduct of pastoral duties on behalf of the Church. This is particularly true since there was no evidence that the Church regularly engaged in real estate development transactions of any type. We fail to see how Reverend Steel's actions in embroiling the Church in the Figueroa property transaction could be deemed foreseeable.

As the Supreme Court explained in *Lisa M.*, the primary question which must be determined is whether " '[i]n the context of the particular enterprise an employee's conduct is . . . so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Lisa M. v. Henry Mayo Newhall Memorial Hospital, supra*, 12 Cal.4th at p. 299, quoting *Rodgers v. Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 618 [124 Cal.Rptr. 143].) There is nothing fair or equitable

---

[21]None of the parties has asked that we express an opinion on the lawfulness of the agreement, and so we resist the temptation.

about permitting a third party to attribute a corporate employee's acts to the corporation where the third party is engaged in a conspiracy with the employee to use the corporation to obtain a benefit for himself.

## C. *Corporations Code Section 208*

One final matter we must examine is whether the Corporations Code prevents the Church from asserting the defenses which, under our analysis, should have resulted in grant of the Church's motion for nonsuit or JNOV. Section 208 of the Corporations Code provides: "No limitation upon the business, purposes or powers of the corporation or upon the powers of the shareholders, officers or directors, or the manner of exercise of such powers . . . shall be asserted as between the corporation . . . and any third person" with certain exceptions not relevant here. (Corp. Code, § 208, subd. (a), fns. omitted.) Corporations Code section 313 provides: "Subject to the provisions of subdivision (a) of Section 208, any *note*, mortgage, evidence of indebtedness, contract, share certificate, initial transaction statement or written statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, *executed or entered into between any corporation and any other person, when signed by* the chairman of the board, *the president* or any vice president and the secretary, any assistant secretary, the chief financial officer or any assistant treasurer *of such corporation, is not invalidated as to the corporation by any lack of authority of the signing officers in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same.*" (Italics added.)

In *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754 [98 Cal.Rptr.2d 1, 3 P.3d 286], the Supreme Court explained: "At common law, the party seeking to enforce a contract with a corporation generally had the burden of establishing the contracting officer's authority to bind the corporation." (*Id.* at p. 779.) "For the party seeking to establish the validity of a contract at common law, formerly a corporate seal affixed to an agreement, although 'not essential to the validity of such contract,' provided presumptive evidence that the officer executing the agreement had the requisite authority to bind the corporation." (*Id.* at p. 780.) "[T]he presumption was subject to rebuttal by affirmative evidence establishing the absence of actual authority, requiring the party seeking enforcement based upon ostensible authority to establish justifiable reliance upon the agreement." (*Id.* at p. 781, italics omitted.) Then, Corporations Code section 313 was added, "specifying that an instrument entered into by a corporation is not invalidated by any lack of authority on the part of the officers executing the instrument if (1) it has been executed by the designated officers, and (2) the other party does not have actual knowledge that the signing officers lacked authority to execute the instrument." (*Snukal v. Flightways Manufacturing, Inc.*, at p. 782.)

"It is apparent that, if its criteria are met, Corporations Code section 313 precludes the invalidation of an instrument entered into by a corporation, *despite* the presentation of evidence demonstrating that *the signing officers* lacked authority to execute the instrument on its behalf. Thus, the statute provides a conclusive, rather than a merely rebuttable evidentiary presumption of authority to enter into the agreement on the part of the specified corporate officers. . . . [¶] In addition, Corporations Code section 313 applies so long as the other party does not have *actual knowledge* that the executing officers lack authority. Because the statute applies even when the other party should have, but does not have, actual knowledge of the officers' lack of authority, that party is relieved of the burden of establishing *justifiable* reliance upon the authority of the executing officers. Thus, this statute provides greater protection to the other party than does Corporations Code former section 833—once the presumption of the latter statute was rebutted by evidence of a lack of actual authority, the other party was required to establish ostensible authority, including a showing of justifiable reliance upon the apparent authority of the executing officers. [¶] . . . [¶] [Section 313] limits the burden of proof, insofar as the third party's knowledge is concerned, to a showing that he or she did not have actual knowledge of any lack of authority on the part of the signing officers. In so providing, the statute's purpose is to permit the third party to rely upon the assertive authority of the officers designated by the statute." (*Snukal v. Flightways Manufacturing, Inc., supra,* 23 Cal.4th at pp. 782-783.)

Dr. Saks contends that he had no actual knowledge that under the Church's bylaws Reverend Steel lacked authority to enter into real estate transactions or sign notes on behalf of the Church. Is he therefore entitled to an irrebuttable presumption that the note was valid? We are not convinced that the "actual knowledge" referred to in the statute and the Supreme Court's *Snukal* opinion is limited to knowledge of the contents of a corporation's files. In discussing the similar presumption contained in section 208 of the Corporations Code, Witkin has said: "It seems clear . . . that if a third party knowingly participates with officers in a fraud upon the corporation, he is not entitled to the protection of this section." (9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 129, p. 627; accord, Civ. Code, § 2306; 1 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 2000) § 85.02, p. 5-34 ["[I]f a third party knowingly participates in the perpetration of a fraud upon a corporation or in any abuse of authority by its officers or directors, it would seem that, as under former law, that knowing participation would be a defense or ground of invalidity at least as to such third party."].) Since no corporate officer could have authority to pledge the corporation's assets to a deal which benefits the promisee (and possibly the officer), but not the corporation, knowledge on the part of the promisee that he is involved in such a transaction should suffice for purposes of the Corporations Code.

At the risk of belaboring the point, Dr. Saks knowingly participated in a scheme to obtain money from a public agency and real property for himself and his cohorts through use of the Church's good name. To permit him to rest on his lack of actual knowledge of the contents of the Church's bylaws to support a recovery against the Church would result in an injustice unsupported by any law.

### D. *Procedural Error*

 Although our decision to reverse based on lack of substantial evidence to support the jury's verdict on Dr. Saks's breach of contract and fraud claims against the Church essentially renders the other issues raised on appeal moot, we cannot avoid commenting on several instances of substantial error, any one of which would have justified reversal.

#### 1. *Unsubstantiated RICO Claim Given to Jury*

As was noted above, the jury was asked to find whether the Church had violated RICO, although the court had previously granted the Church's motion for nonsuit on the RICO claim. The trial court attempted to correct this, ruling in a postverdict order that "[i]n light of the court's prior order made June 22, 1993, wherein defendants' motion for non-suit as to defendant [Church] and the RICO claims was granted, the court finds that the special verdict rendered by the jury is inconsistent and the issue was not one for determination by the jury." But the damage had already been done. Permitting the jury to believe that there was sufficient evidence to connect the Church with a racketeering organization when there was not, could have prejudiced their consideration of the evidence of fraud and breach of contract, as well as the affirmative defenses raised by the Church.

#### 2. *Discrepancy in Final Judgment*

On December 7, 1993, the trial court purported to enter a judgment on the jury's special verdict, although there were equitable issues which had yet to be resolved. The document entitled "Judgment on Special Verdict" consisted of two parts, (1) a verbatim transcript of the jury's special verdict and (2) a final order which stated that Dr. Saks was "entitled to" judgment against Caldwell, Reverend Steel, and the Church in the amount of $1,637,970; judgment against Caldwell individually in the amount of $584,970; and judgment against Reverend Steel and the Church in the amount of $1,053,000. Having said that, however, the order "ordered, adjudged, and decreed" that "Plaintiff Lawrence Saks, M.D. shall have judgment against Craig E. Caldwell, Sam Steel, Jr., and [the Church], jointly and severally, in

the amount of $2,671,410.00 . . . ." This figure represented the RICO damages.[22] The court should not have purported to enter judgment when there were still claims to be resolved, but having chosen to do so, we cannot fathom why the court entered judgment on the RICO claim only and why the judgment on the RICO claim initially included the Church, given the court's earlier rulings.

The Church then submitted its motions for new trial and JNOV on all claims. One of the arguments made was that judgment should not be entered against the Church for fraud because "[p]rior to submission of the case to the jury, the Court granted the Church's motion for directed verdict on Saks' . . . fraud (intentional misrepresentations and fraudulent concealment) claims against the Church. Following further discussion with the Court, the Church withdrew its motion for directed verdict on the Plaintiff's fraud claims thereby allowing Plaintiff's intentional misrepresentation and fraudulent concealment claims to proceed to decision by the jury." The Church "withdrew its motion for directed verdict, and gave up the benefit of the Court's favorable ruling thereon, upon the understanding that, if for any reason the jury returned verdicts against the Church on Plaintiff's intentional misrepresentation and/or fraudulent concealment claims, the Court would grant the Church's post trial motions for new trial and JNOV consistent with the Court's earlier ruling that the Church was entitled to have such claims dismissed." The Church further argued that in view of the uncontradicted evidence that Dr. Saks, Caldwell, and Reverend Steel used the Church's name in order to facilitate their plans to finance their ownership and development of the Figueroa project with money from the City, the underlying transaction represented a fraud on the Church, and that there was no evidence to sustain a finding that Reverend Steel was acting as an agent for the Church rather than in pursuit of his own personal interests.

After hearing these motions, the court ruled that it was changing the prior judgment in two respects. First, "the Judgment filed December 7, 1993 is hereby amended to include the following, only: [¶] . . . the following is added: [¶] (1A) Plaintiff Lawrence Saks, M.D., shall have judgment against defendant [the Church] for *breach of contract* in the sum of $1,053,000.00." (Italics added.) Second, "the Judgment filed December 7, 1993 is ordered vacated and set aside in the following respect only: . . . recovery by the plaintiff against defendant [the Church] in item (1) of the judgment [the judgment on the RICO claim] is vacated and set aside and plaintiff's judgment in item (1) is only as to the other named defendants therein."

---

[22]Earlier, the court had entered an order calculating RICO damages. Essentially, the court ruled that the $1,637,970 awarded by the jury should be reduced by the $747,500 attributed by the jury to the note secured by a deed of trust and then trebled, resulting in damages of $2,671,410.

Concerning the JNOV, the court stated: "The motion of judgment notwithstanding the verdict is denied as to defendants Craig E. Caldwell and the Estate of Sam Steel, Jr. The motion is granted as to defendant [the Church] as to the first cause of action [RICO] in keeping with the court's minute order made June 22, 1993 wherein it granted a motion for non-suit on behalf of defendant Church on the RICO claim. As to the remaining causes of action against defendant Church the motion is denied."

The court stated it was denying all defendants' motions for new trial, except as follows: "The motion for new trial is granted with respect to defendant [the Church], only, on the issue of damages only, unless the plaintiff will accept a remittitur of $305,500.00 to conform with the evidence whereby the jury found in . . . the Special Verdict that foreclosure by plaintiff Saks of the real property at 7000 South Figueroa Street had a value of $747,500.00."

As a result of these various motions and rulings, there was a judgment entered against the Church in the amount of $305,500 for breach of contract, and a JNOV in favor of the Church on the RICO claim. The fraud claim against the Church was, however, in limbo.[23] The court had denied the Church's JNOV, but at the same time had entered no judgment on fraud that we can find. In addition, not one word had been said in the order about the allegation that the court had essentially promised to rule favorably to the Church on the fraud claim if the Church withdrew the previously granted motion for nonsuit.[24]

On July 7, 1994, the court held a hearing on a "motion to correct a clerical error" brought by the Church. Although we do not have the moving papers in the record provided to us, apparently the Church's counsel contended that the minute order contained an error and that the court must have intended to grant the JNOV on the fraud claim due to the fact that no judgment was entered against the Church on the fraud claim. The court denied the motion stating, "Let it ride[,] [t]est it over across the street" without any further explanation.

---

[23]We note that there was similarly no judgment entered on the jury's finding that Reverend Steel and the Church breached a fiduciary duty owed to Dr. Saks. This is understandable, however, because (1) the breach of fiduciary duty claim in the FAC was asserted against Caldwell only; and (2) there was no evidence supporting the existence of any relationship between Dr. Saks and Reverend Steel and/or the Church which might have given rise to a fiduciary duty. Less understandable is why the special verdict form given to the jury included Reverend Steel and the Church in the breach of fiduciary duty claim.

[24]Dr. Saks does not deny that the alleged exchange took place. His respondent's brief merely points out that the relevant reporter's transcript is not in the record, and that any bargain struck in the alleged manner would probably be unenforceable.

On this record, we would be unable to affirm the jury's verdict on the fraud claim even if it were supported by the evidence. The discrepancy in the record we have noted was brought to the trial court's attention, and the court refused to correct the record or explain its actions. Affirmance would be impossible because there is no way of knowing whether the "clerical error" was in failing to enter judgment against the Church on fraud or in denying the motion for JNOV for fraud.

### 3. *Ruling on Equitable Claims*

Trial to the court on the equitable issues commenced in July 1994. The court identified the equitable claims to be tried as (1) a claim for declaratory relief establishing the existence of partnership and the rights and duties under the partnership agreement and possible breach of contract by Dr. Saks; (2) a claim for rescission of the two notes; (3) a claim for reformation of the two notes; and (4) a claim that Dr. Saks should be equitably estopped from enforcing the notes.[25]

During this portion of the trial, Oritta Williams, a member of the Church's board of trustees, testified that Reverend Steel never asked the board of trustees to approve the purchase of the land. The Church's bylaws required property transactions to be approved by the board of trustees. Ronnie Hillman, another board member, similarly testified that Reverend Steel had no authority to borrow money in the Church's name. He testified that the Church board and membership did not hear about the transactions in which Reverend Steel was involved until sometime long after the lawsuits were filed. Carl Steel, chairman of the board and Reverend Steel's brother, testified that information about the transaction came out after the jury verdict.

Angela Basile, Caldwell's former secretary, testified that she had a conversation with Dr. Saks about the Figueroa transaction during the relevant time frame. Dr. Saks stated during the conversation that there were certain things that he wanted from Caldwell. Basile wrote down some of his comments. These comments were on a document which was placed into evidence. The notes referred to Dr. Saks's desire for a letter confirming a "20/40/40" partnership split; 50 percent of fees and profits to him and to Caldwell; and "577" returned in 60 days "when CDD [referring to Community Development Department] funds."

At the equitable trial, Dr. Saks denied having had that conversation with Basile. He testified he was never involved in a partnership to purchase the

---

[25]The court also referred to the claim for injunction to prevent the foreclosure, which had been rendered moot by the occurrence of the foreclosure.

land on Figueroa. He said he agreed to loan money to the Church and Reverend Steel secured by the property, that the bulk of the money would be paid back in 30 days and the rest in one year, and that he and Caldwell would talk about forming a partnership to develop the property after the money was repaid. He said he had no understanding as to how the note would be paid, and no one represented that the source of the funds to repay the note would be a loan or grant from the City. Although there was talk about a loan or grant and Caldwell told him he would get repaid when the City funded a loan or grant, he did not rely on it.[26] There was to be a partnership at some point in the future comprised of him and Caldwell, but not Reverend Steel or the Church.

Dr. Saks further testified that when Reverend Steel came to sign one of the notes, he told Dr. Saks that he or the Church would make interest payments, and that he or the Church would make good on the note. Dr. Saks could not recall which note.

Dr. Saks called two additional witnesses who testified that shortly before his death Reverend Steel had admitted lying during his testimony about the meeting at a restaurant at which the details of the partnership agreement were supposedly worked out.[27]

During the course of this testimony, the trial court repeatedly made comments to the effect that the evidence had already been presented to the jury, or, with regard to new evidence, that the testimony should have been before the jury. At the end of the trial, the court stated: "The evidence was given to 12 people on the jury that made this decision in that case. I'm not about to substitute my opinion, frankly" and "I am not going to substitute my opinion for the credibility of Dr. Saks and Reverend Steel and the rest of them that the jury decided."

---

[26]We note that this testimony was directly contradicted not only by his testimony in the trial on the legal claims, but also by the allegations of his original and amended complaints in which he based his fraud claim in part on "defendants[']" representations "that Caldwell would repay Saks's loan to Reverend Steel," and "that [Caldwell] had arranged a $575,000 loan from a government agency, which would repay Saks's $575,000 loan." Since the only other allegations supporting the fraud claim—concealment of the existence of lis pendens on the Figueroa property and representation that CBC was the owner of the property—were not attributed to Reverend Steel, this testimony further undermines the fraud claim against the Church.

[27]In November 1993, in conjunction with a motion to advance the hearing date on the equitable claims, Dr. Saks provided a declaration which stated that he had essentially been called to Reverend Steel's deathbed and told by Reverend Steel that he had perjured himself at trial at the direction of Caldwell and said whatever Caldwell told him to say. Reverend Steel, in particular, denied that the restaurant meeting with Caldwell and Dr. Saks occurred. This meeting was arranged by Carl Steel after he learned about the pending litigation. Reverend Steel died on December 4, 1993.

The Church contends that these statements indicated that the court abdicated its responsibility to determine the equitable claims. Dr. Saks maintains that the court was merely exercising its right to adopt the jury's advisory findings, and that in any event all of the equitable claims were subsumed by legal claims for which there was a right to trial by jury.

There can be no question that there may be an advisory jury in an equitable action, and that a trial court has the discretion to submit issues to a jury and adopt the jury's findings on factual matters. (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 123 [84 Cal.Rptr.2d 753]; *A-C Co. v. Security Pacific Nat. Bank* (1985) 173 Cal.App.3d 462, 474 [219 Cal.Rptr. 62].) Clearly, however, no such procedure was followed here. Instead, the court elected to bifurcate equitable and legal issues and hold a separate trial on the equitable claims after the trial on the legal claims concluded. The court thus implicitly agreed to consider not just the evidence presented to the jury, but also any additional evidence offered during the equitable trial. The Church brought in new witnesses who, according to the trial court's repeatedly expressed belief, presented a stronger case for the Church's lack of complicity in the Figueroa property transaction than had been presented to the jury. In addition, Dr. Saks's credibility became subject to question due to Basile's testimony concerning his demands to Caldwell and his own testimony professing ignorance about the source of funds to repay the notes—contradicting both his earlier testimony and the allegations of his complaint. Having encouraged the Church's counsel to expect a separate court trial on equitable claims, the court chastised him for not presenting all of the evidence to the jury. Then, the court disregarded the new evidence and entered a judgment based on the jury's earlier findings, although it had previously expressed doubt concerning the accuracy of these findings on both the fraud allegations and the intention of the parties concerning the promissory notes.[28]

Where a trial court indicates that it disagrees with the jury but nevertheless enters judgment or equitable claims based on the jury's factual findings, the matter should be remanded for clarification and proper exercise of independent judgment. (*Posey v. Leavitt* (1991) 229 Cal.App.3d 1236, 1242, 1248-1249 [280 Cal.Rptr. 568] [court denied injunction seeking removal of condominium deck extension because it was not "inclined to . . . set aside the jury's verdict [that the deck was neither a nuisance nor a trespass]" but

---

[28]We have already discussed the court's statements in connection with the Church's motion for nonsuit on the fraud claim. With respect to the contract claim, the court stated at a point near the close of the first part of the trial: "I am satisfied that the parties to such writings did not intend that such promissory note and trust deed would represent any legal obligation by the Church to Saks."

stated: " '[I]f the court really had any equitable power it could use, the best thing it could do would be to put the clock back . . . .' "]; *A-C Co. v. Security Pacific Nat. Bank, supra,* 173 Cal.App.3d at p. 474 ["It is . . . beyond dispute that while a jury may be used for advisory verdicts as to questions of fact, it is the duty of the trial court to make its own independent findings and to adopt or reject the findings of the jury as it deems proper"].) Had our decision on the fraud and breach of contract claims not rendered the equitable issues raised by the Church moot, application of this rule would be particularly appropriate here where the court not only expressed disagreement with the verdict at the end of the first part of the trial, but heard additional evidence which cast further doubt on the jury's findings.

### 4. Statement of Decision

On August 30, 1994, during the trial on the equitable claims, the court apparently showed the parties a tentative ruling on a number of pending matters (including the motion for clarification discussed above). During a colloquy with counsel, the court volunteered to provide a statement of decision, incorporating its previous orders and the tentative ruling. Counsel for the Church expressed concern over whether the court intended to make an independent determination of the facts. The court stated that it would do a statement of decision "orally here in court" and "try and do" a written statement of decision.

On September 21, 1994, both sides rested, and counsel for the Church asked for the opportunity to submit a brief on the following Tuesday. The court informed counsel: "Well, you won't have a decision . . . , unless you waive the statement of decision. . . . I'm leaving the bench. Thursday is my last day." Counsel replied, "[W]e would like the court to follow the Code and give us a written decision . . . where the court goes through and makes its own determination on the record." The court responded, "Very good," and then a discussion took place concerning when final briefing would be due so that the court would have time to complete a statement of decision.

The court did not prepare a written statement of decision. Instead, there was an oral statement read into the record and a reporter's transcript, which was appended to a minute order. In the transcript, the court stated the following findings and conclusions: (1) "[T]he Church and [Reverend Steel] are not entitled to any relief in law or equity from the promissory notes"; (2) "[Reverend Steel] lied under oath and committed perjury during the trial of this matter"; (3) "[T]here was no partnership in existence for the purchase of the property at 7000 South Figueroa and . . . neither the Church nor [Reverend Steel] are entitled to any relief whatsoever"; (4) "The jury in the

underlying case found that there was no partnership agreement between [Reverend Steel], Caldwell, Church and Saks to purchase and develop 7000 South Figueroa"; (5) "The jury also determined that [Reverend Steel] and Church were liable on the $235,000 note and the $575,000 note and trust deed"; (6) "The jury also found against [Reverend Steel] and Church on their defense that the two promissory notes were sham transactions"; (7) "The jury in the underlying case has determined the factual issues now presented by [Reverend Steel] and Church under their equitable claims"; (8) "[Reverend Steel] and Church had adequate legal remedies and defenses under which to assert their positions and the jury determined these factual issues against them. They were afforded the opportunity to assert a breach of contract claim and a sham transaction legal defense to the notes which encompassed the same factual assertions of a 7000 Figueroa partnership and contingency on payment which the jury rejected and they are now rearguing to the court. There is nothing sought under the asserted equitable claims which was not sought under a legal theory. They had adequate remedies at law and the jury simply did not believe their version of these transactions"; (9) "The jury in the underlying case in their verdict also awarded [Reverend Steel] and Church credit of $747,500, which obviously indicates that they found against Caldwell and [Reverend Steel] on all legal issues, including the sham defense."

We asked the parties for supplemental briefing on the question of whether a statement of decision was requested or prepared and the consequences of failure to provide a statement of decision. Dr. Saks contends that the failure to formally request a statement of decision "within ten days after the court announces its tentative decision . . . specify[ing] those controverted issues as to which the party is requesting a statement of decision" under Code of Civil Procedure section 632 means that the court was not obligated to provide a statement of decision. Ordinarily this would be the case. But here, the trial court volunteered to provide a statement of decision and was clearly familiar with the outstanding issues which had been extensively briefed. Dr. Saks did not object or request clarification of the issues. The Church cannot be faulted for failing to submit a more formal request, particularly since the judge's impending retirement left no time for the statutory procedures to be strictly followed.

By the same token, we cannot fault the trial court for reading its decision into the record and filing the reporter's transcript in lieu of a written statement of decision. As Dr. Saks concedes, this violated the procedures set forth in California Rules of Court, rule 232, which requires, among other things, a proposed statement of decision and an opportunity for comment by both sides.. But, once again, since neither side objected to this unorthodox procedure at the relevant time, it cannot be the basis for complaint on appeal.

Based on our previous discussion, however, we do find fault with the substance of the order. The trial court stated in a conclusory fashion that the Church was "not entitled to any relief in law or equity from the promissory notes" and summarized the jury's findings, but it did not state whether or not it agreed with these findings or adopted them as its own. As we have seen, this was improper. (*Posey v. Leavitt, supra,* 229 Cal.App.3d 1236; *A-C Co. v. Security Pacific Nat. Bank, supra,* 173 Cal.App.3d 462; see also *Nelson v. Anderson, supra,* 72 Cal.App.4th at pp. 123-124 [appellate court questioned, without deciding, the validity of a judgment entered on an equitable claim where the trial judge did not expressly or impliedly indicate agreement with the jury's verdict or adoption of it].)

## DISPOSITION

The judgment in favor of respondent Lawrence Saks, M.D., and against appellant Charity Mission Baptist Church on Dr. Sak's complaint is reversed. The judgment is affirmed in all other respects. The church is to recover its costs on appeal.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 21, 2001, and the opinion was modified to read as printed above.